```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
PAUL H. SCHWEIZER, W. STUART
SCHWEIZER, LESLIE E. SCHWEIZER AND
KAWADA INDUSTRIES INC.,

                        Plaintiff,            10-CV-6547

             v.                                **DECISION**
                                               **and ORDER**
SIKORSKY AIRCRAFT CORPORATION,

                        Defendant.
_____
```

### **INTRODUCTION**

Plaintiffs, Paul H. Schweizer, W. Stuart Schweizer, Leslie E. Schweizer (collectively the "Schweizer Plaintiffs") and Kawada Industries Inc. (collectively, "Plaintiffs"), bring this action against Defendant, Sikorsky Aircraft Corporation ("Defendant" or "Sikorsky"), alleging breach of contract and the implied duty of good faith and fair dealing. Specifically, Plaintiffs allege that Defendant breached the express and implied terms of the stock purchase agreement entered into by the parties for the sale of Plaintiffs' aircraft manufacturing business and that Plaintiffs suffered damages therefrom.

Defendant moves to dismiss the Second, Third and Fourth Causes of Action in the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"), arguing that Plaintiffs have not alleged a plausible claim for relief. Plaintiffs oppose the motion and contend that they have stated a plausible claim for

relief with respect to each Cause of Action in the Complaint. For the reasons set forth below, this Court grants Defendant's motion to dismiss Plaintiffs' Third Cause of Action and denies Defendant's motion to dismiss Plaintiffs' Second and Fourth Causes of Action. Accordingly, Plaintiffs' Third Cause of Action is hereby dismissed with prejudice, and the Defendant is directed to answer the Complaint with respect to the remaining claims.

## BACKGROUND

The following facts are taken from the Complaint, the Stock Purchase Agreement ("SPA") entered into by the parties and dated August 26, 2004 and the employment agreements between the Schweizer Plaintiffs and Defendant.[1] The Schweizer Plaintiffs were the majority shareholders and executive officers of Schweizer Aircraft Corp. ("Schweizer"), a closely held aviation products manufacturer in Elmira, New York, from 1983 until late 2004.[2] Kawada Industries Inc. purchased a 25% share of the company in 1992, but Schweizer remained majority owned and operated by the Schweizer Plaintiffs

---

[1] In connection with a motion to dismiss under Rule 12(b)(6), the court generally may consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." See Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 100 (2d Cir.2005). As the SPA and the employment agreements are attached to the Complaint and incorporated into the Complaint by reference, this Court will consider these documents in connection with Defendant's motion to dismiss.

[2] Schweizer was originally founded in 1937 by brothers Earnest (father of Plaintiff Leslie Schweizer) and Paul Schweizer. William Schweizer (father of Plaintiffs Paul and Stuart Schweizer), Earnest and Paul's younger brother, joined them in 1941. The Schweizer Plaintiffs joined the company in the 1970's and became the company's majority shareholders and executive officers by 1983.

until September 24, 2004, the closing date under the SPA, when Sikorsky purchased all of Plaintiffs' shares in Schweizer. Sikorsky designs, manufactures and services military helicopters and other advanced aircraft, and is wholly-owned by United Technologies Corporation.

The SPA provided that Sikorsky would purchase all of the shares of Schweizer from Plaintiffs for $12 million in cash on the closing date and certain other deferred and contingent payments. The deferred and contingent payments were conditioned on, *inter alia*, the completion of a program called RU-38B within the estimated budget for that program and the costs of defending and/or settling several pending or potential product liability lawsuits.[3]

The SPA and the employment agreements between the Schweizer Plaintiffs and Defendant also provided that following the sale of Schweizer, the Schweizer Plaintiffs were to remain with the company during a three-year transition period, and that they would have substantially the same responsibilities during this time. Plaintiffs allege that, because of their written agreements with Defendant, they believed they would continue to run the company and play a key role in management decisions during this three-year transition period. Thus, by remaining in day-to-day control, they

---

[3]The contingent and deferred payments were also conditioned on other pending indemnity claims and the completion of several pending projects within a certain period of time. However, at issue in this lawsuit are the costs of the pending product liability claims and the RU-38B program. Therefore, the Court has only set out the contingent and deferred payment structure with respect to these costs.

believed they would have greater control over the possibility of realizing the deferred and contingent payments under the SPA.

As part of the parties' agreement regarding the contingent payment, Section 6.6 of the SPA reads as follows:

> Buyer shall defend, through counsel of its choosing, any third party claim, action or suit related to product liability. Buyer and Sellers shall work together and cooperate in pursuing the defense of any third-party claim, action or suit related to product liability where such claim, action or suit will not exceed the limitations of this section. If Buyer and Sellers should not agree with regard to any decision involving a product liability case, Buyer shall have the right to conduct and control the defense and Buyer may compromise or settle any third party claim, action or suit at its sole discretion.

<u>See</u> Stock Purchase Agreement, Section 6.6 (Docket No. 1).

Plaintiffs disclosed two potential product liability claims to Defendants during their due diligence investigation. The potential product liability claims related to the crash of a Model 300C helicopter in January 2003 ("Remcho"), and the crash of a Model 300CB helicopter in August 2002 ("Kelly/Landy"). Plaintiffs allege that both Schweizer employees and the National Transportation Safety Board ("NTSB") investigated the crashes and determined that neither accident was the result of a product defect or failure.

Plaintiffs allege that they expected to have some modicum of control over the manner in which these product liability claims were handled during the three-year transition period. Schweizer's litigation philosophy, prior to its sale to Defendant in 2004, was

to settle only those claims that were properly attributable to a product defect or failure. Under this philosophy, Plaintiffs would not have settled the Remcho and Kelly/Landy cliams. Plaintiffs allege that they decided to sell the company to Defendant, rather than to other potential buyers, in part, because Defendant told the Plaintiffs that its product liability philosophy was the same as theirs, because Defendant was obligated to "work together and cooperate" with them in defense of the claims pursuant to Section 6.6 of the SPA, and because the Schweizer Plaintiffs' employment agreements stated that they would have the same responsibilities after the sale, which included responsibility for product liability claims.

The deferred payment clause in the SPA provided for payments to be made in the amount of $4 million, less the total amount of any indemnity matters, which included cost overages on the RU-38B program. The RU-38B program was a fixed price contract between a United States Government agency and Schweizer for the manufacture of a three covert surveillance aircrafts. The contract was for $12.8 million. Plaintiffs allege that in May 2004, Schweizer estimated that the cost to complete the RU-38B program would be $13.8 million. Therefore, a $1 million reserve was set up on the pre-closing balance sheet for cost overages. Plaintiffs allege that they believed that the Schweizer Plaintiffs' continued employment with the company would allow the project to be completed within the

estimated budget, which was based on the historic costs of the project under their leadership.

In July 2004, Randy Simpson ("Simpson") was hired by Sikorsky to act as an onsite general manager following the sale of the company. Plaintiffs allege that, while they knew prior to the sale that Simpson would be hired, they believed that the Schweizer Plaintiffs would continue to run the company for the three-year transition period, as was memorialized in their employment agreements. However, following the closing, Simpson began to actively manage the company with less input from the Schweizer Plaintiffs, including with respect to key decisions regarding the RU-38B program and the settlements of the Remcho and Kelly/Landy product liability claims.

Plaintiffs allege that, following the sale, the Remcho and Kelly/Landy matters were managed by a team of outside lawyers and experts, instead of directly through management, as had been the case when the company was owned by the Plaintiffs. Plaintiffs allege that Defendant decided to settle both potential lawsuits without input from Plaintiffs, and that the amount of the settlement (approximately $4.5 million for Remcho and $4 million for Kelly/Landy) was far greater than the amount reserved on the pre-closing balance sheet ($1 million). Plaintiffs allege that Defendant failed to consult Plaintiffs or follow the expected product liability philosophy, and that the settlements, if any,

would have been less than $1 million if the Schweizer Plaintiffs had retained management over the lawsuits as they expected.  As a result of the higher than estimated settlements, Defendant did not pay Plaintiffs the contingent payments under the SPA.

Plaintiffs further allege that the Schweizer Plaintiffs were directed to work on projects that were specific to Sikorsky, and that, due to the shift in leadership, costs rose and efficiency decreased on all projects, including the RU-38B program.  Plaintiffs claim that their efforts and the efforts of many of their skilled employees were directed away from the RU-38B program.  As a result, the RU-38B program incurred cost overruns of $2,840,848, which was debited from the deferred payment owed to Plaintiffs.  Plaintiffs allege that if the Schweizer Plaintiffs had been permitted greater control over the project, it would have been completed within the estimated budget.

Plaintiffs contend that, had they been consulted by Defendants when key management decisions were made regarding the RU-38B program and the product liability claims, as was their expectation under the SPA and the Schweizer Plaintiffs' employment agreements, the cost overruns on the RU-38B program and the higher than expected settlements may not have occurred. Accordingly, they would have realized more of the contingent and deferred payments under the agreement.

**DISCUSSION**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." See Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir.2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a Rule 12(b)(6) motion to dismiss, the Court "'must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.'" See Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir.2008) (quoting Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir.2007)).

A.  The Product Liability Settlements

   1.  Breach of Contract

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2nd Cir. 2004)(quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir.1996). Plaintiffs have alleged that the parties entered into an agreement, the SPA, for the sale of all of Plaintiffs' stock in Schweizer, and that Plaintiffs did sell their stock to Schweizer. See Compl. ¶1. Plaintiffs further allege that Section 6.6 of the SPA obligated Defendants to "work together and cooperate" with

Plaintiffs on the defense of the Remcho and Kelly/Landy product liability claims, Defendants breached this section of the SPA, and Plaintiffs suffered damages from the breach. See Compl. ¶76-80. This Court finds that Plaintiffs have adequately plead a cause of action for breach of contract. Accordingly, Defendant's motion to dismiss Plaintiffs' Second Cause of Action is denied.

Defendant argues that Plaintiffs have not established a cause of action for breach of contract because the SPA specifically provided that Defendant had the right control and settle the product liability claims "at its sole discretion." See Def. Mem. of Law at 8-9. Defendant argues that Plaintiffs could not have suffered damages because Defendant had the "absolute right" to unilaterally settle the claims. Id. Defendants further argue that the damages Plaintiffs claim are too speculative to establish a claim for breach of contract. See Def. Reply at 6, note 4.

Plaintiffs contend that Defendant's right to settle the claims was contingent upon its obligation to consult with Plaintiffs regarding their defense. See Pl. Mem. of Law at 13-15. They argue that the phrases, "shall work together and cooperate" and "[i]f Buyer and Sellers should not agree with regard to any decision involving a product liability case," should be read together to create a condition precedent to Defendant's rights under Section 6.6. Id. Thus, Plaintiffs argue, Defendant's right to settle in its sole discretion would only arise should the parties consult with

each other and disagree on the appropriate course of action with respect to the lawsuits. Id. And, as Plaintiffs allege that Defendant did not consult with them, they did not have the unilateral right to settle the claims. Id. Further, Plaintiffs argue that had Defendant consulted with Plaintiffs, as required under Section 6.6, the settlements would have been lower and Plaintiffs would have realized more of the contingent payments.

While not commenting on the strength of Plaintiffs' case, this Court finds that Plaintiffs have sufficiently plead a plausible claim for relief. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Eternity, 375 F3d 168, 176-177 ("This Court has held that 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" citing Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)). A court's belief or disbelief in a complaint's factual allegations or its belief that a "recovery is very remote and unlikely" does not factor into a decision under Rule 12(b)(6). See id. Plaintiffs must only state a plausible claim for relief at this stage, and this Court finds that Plaintiffs have met this burden.

The parties' disagreement over whether the obligation to "work together and cooperate" in Section 6.6 of the SPA was a condition

precedent to Defendant's right to settle the lawsuits in its sole discretion is immaterial to whether Plaintiffs have stated a plausible cause of action for breach of contract. The obligation to "work together and cooperate" was expressly included in the agreement, and Plaintiffs allege that Defendant breached this term of the agreement by settling the cases without seeking their input and that they suffered damages therefrom. This Court finds that Plaintiffs have, at a minimum, stated a plausible claim for relief. Accordingly, Defendant's motion to dismiss Plaintiffs' Second Cause of Action is denied.

    2. The Implied Covenant of Good Faith and Fair Dealing

In New York, there is a promise of good faith and fair dealing implicit in every contract, which provides that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract..." See M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990); see also Skillgame, LLC v. Brody, 1 A.D.3d 247 (1st Dept. 2003); 511 W. 232nd Owners Corp. V. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002). However, "no obligation can be implied...which would be inconsistent with other terms of the contractual relationship." See Horn v. New York Times, 100 N.Y.2d 85, 92 (2003). And, a defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract. See DCMR v. Trident Precision Mfg., 317 F.Supp.2d 220, 226 (W.D.N.Y.

2004); Assoc. Capital Serv. Corp. of New Jersey v. Fairway Private Cars, Inc., 590 F.Supp. 10, 16 (S.D.N.Y. 1982).

New York does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a complaint asserts a breach of contract claim based on the same facts. See Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002); See Ari and Co. v. Regent Int'l Corp., 273 F.Supp.2d 518, 522 (S.D.N.Y. 2003). Courts have consistently dismissed claims for breach of the implied covenant as "redundant where the conduct allegedly violating the implied covenant is also the predicate for breach...of an express provision of the underlying contract." See Alter v. Bogoricin, 1997 WL 691332, *7 (S.D.N.Y. 1996) ("[T]he covenant of good faith and fair dealing is not distinct from the underlying contract, and therefore, 'as a general rule, the cause of action alleging breach of good faith is duplicative of a cause of action alleging breach of contract[.]") (citations omitted); W.S.A., Inc. v. ACA Corp., 1996 WL 551599, at *9 (S.D.N.Y. 1996) ("[E]very court faced with a complaint brought under New York law and alleging both breach of contract and breach of the implied covenant of good faith and fair dealing has dismissed the latter claim as duplicative.").

Consequently, a claim for breach of the implied covenant of good faith can survive "only if it is based on allegations different from those underlying the accompanying breach of contract claim."

See Siradas v. Chase Lincoln First Bank, 1999 WL 787658, at *6 (S.D.N.Y. 1999). Moreover, where the relief sought in claiming a breach of the implied covenant of good faith is "intrinsically tied to the damages allegedly resulting from [the] breach of contract," there is no separate and distinct wrong that would give rise to an independent claim. See Alter, 1997 WL 691332, at *8.

Here, Plaintiffs allege that "it was an implied term of the [SPA] that Sikorsky act in good faith and make reasonable and diligent efforts to settle" the claims. See Compl. ¶19. Plaintiffs acknowledge that, in order to state a claim for breach of the implied covenant of good faith, they must state facts that are separate and distinct from those that support the underlying breach of contract claim. See Pl. Mem. of Law at 20. While Plaintiffs' Third Cause of Action also involves the settlement of the pending product liability claims, they argue that it is separate and distinct from their breach of contract claim because "[i]t is certainly possible that if Sikorksy had worked and cooperated with Plaintiffs regarding the [claims], Sikorsky may have also acted in good faith when exercising its sole discretion in settling the [c]laims." Id. at 21-22. Plaintiffs thus argue that, even if Defendant did not breach the terms of Section 6.6, they still acted "arbitrarily and unreasonably" in settling the claims for an amount greater than the $1 million reserved on the post-closing balance sheet. Id. at 22.

However, the facts underlying Plaintiffs' claims are not distinguishable and Plaintiffs' alleged damages are identical for both claims. Plaintiffs allege that Defendant failed to work together and cooperate with them to settle the lawsuits. Plaintiffs further allege that, due to this failure to work together and cooperate, the lawsuits were settled for an amount greater than what was reserved on the post-closing balance sheet. While Plaintiffs allege separately in the Third Cause of Action that Defendant's efforts to settle the cases for a smaller amount were arbitrary and unreasonable, this allegation is not distinct from Plaintiffs' allegation in support of their breach of contract claim that Defendants "needlessly settled the...claims for more than the amount reserved." See Compl. ¶80.

This Court does not find that Plaintiffs have sufficiently stated a separate claim for breach of the implied covenant, as both the underlying facts and alleged damages for both claims are essentially the same. Therefore, Defendants motion to dismiss is granted with respect to this claim. Accordingly, Plaintiffs' Third Cause of Action is hereby dismissed.

B. The RU-38B Program

Plaintiffs' Fourth Cause of Action alleges that Defendant breached the implied covenant of good faith and fair dealing in failing to "make reasonable and diligent efforts to complete the RU-38B Program within the budgeted $13.8 million." See Compl. ¶88.

Plaintiffs further allege that due to Defendant's breach they were unable to realize the full amount of the deferred payment under the SPA. See Compl. ¶88-90. Plaintiffs allege that Defendant's actions (or inaction) with respect to the RU-38B Program "all but assured the diminution" of the deferred payments owed to Plaintiffs under the SPA. See Pl. Mem. of Law at 24. They allege that Defendant "recklessly disregarded" the RU-38B in favor of Sikorsky-centric programs, and that this led to the cost-overruns that resulted in the diminished value of the SPA to Plaintiffs. See id.; Compl. ¶88-90. With respect to this claim, this Court finds that Plaintiffs have adequately plead a breach of the implied covenant of good faith and fair dealing. Accordingly, Defendant's motion to dismiss Plaintiffs' Fourth Cause of Action is denied.

Defendant argues that Plaintiffs' claims should be dismissed because "New York law requires "proof of 1) fraud, 2)malice, 3)bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence." See Def. Mem. of Law at 16. Defendant further alleges that Plaintiffs' claim seeks to impose a duty on parties to a contract to exercise "reasonable and diligent efforts," a duty which does not exist under New York Law. Id.

Initially, this Court notes again that Plaintiffs are not required at the pleading stage to prove that Defendant acted in bad faith. To meet their burden at the pleading stage, Plaintiffs need

only allege facts in support of a plausible claim for relief. This Court finds that Plaintiffs have met their burden with respect to the Fourth Cause of Action.

Plaintiffs allege that Defendant's actions or inaction with respect to the RU-38B Program deprived them of the benefit of the SPA, namely the whole of the deferred payments. They allege that they agreed to the deferred payment clause, in part, because the SPA, in connection with their employment agreements would allow them to control the RU-38B program and its costs to ensure they would receive the payments. However, they allege that Defendant, in bad faith, neglected the RU-38B program in favor of Sikorsky-centric projects. These allegations are sufficient to state a plausible claim for a breach of the implied covenant of good faith and fair dealing. See Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1990)(Finding a breach of the implied covenant where, "[an] implied promise was necessary to effectuate the purposes of the contract, and to the extent [a party to the contract] did not perform these obligations, its lack of diligence destroyed the value of the contract for the company.").

Plaintiffs have sufficiently alleged that there was an implied expectation under the SPA that the programs connected to the deferred and contingent payments would not be neglected so as to diminish the value of such payments to Plaintiffs. Plaintiffs' allegations that Defendant, in bad faith, directed personnel and

resources away from the RU-38B program toward Sikorsky-centric programs and therefore, diminished the Plaintiffs' chances of realizing the deferred payment, sufficiently states a plausible claim for a breach of the implied covenant of good faith and fair dealing. Therefore, Defendant's motion to dismiss Plaintiffs' Fourth Cause of Action is denied.

## **CONCLUSION**

For the reasons set forth above, Defendant's motion to dismiss is granted with respect to Plaintiffs' Third Cause of Action and denied with respect to Plaintiffs' Second and Fourth Causes of Action. Accordingly, Plaintiffs' Third Cause of Action is hereby dismissed and Defendant is directed to answer the remaining claims in the Complaint within 14 days from the date of this Order.

**ALL OF THE ABOVE IS SO ORDERED.**

s/ Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

Dated: Rochester, New York
February 8, 2011