UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| PAUL H. SCHWEIZER, W. STUART SCHWEIZER, LESLIE E. SCHWEIZER and KAWADA INDUSTRIES, INC. | : | Civil Action No.: 10-CV-6547-MAT-MWP |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : | **AMENDED COMPLAINT** |
|  | : |  |
| SIKORSKY AIRCRAFT CORPORATION, | : |  |
|  | : |  |
| Defendant. | : |  |

_____

Plaintiffs, Paul H. Schweizer, W. Stuart Schweizer, Leslie E. Schweizer, and

Kawada Industries, Inc., by their attorneys Phillips Lytle LLP, for their amended complaint

against Defendant Sikorsky Aircraft Corporation, allege as follows:

<u>**Plaintiffs**</u>

1.      Plaintiffs are the former shareholders of Schweizer Aircraft Corp.

("Schweizer" or the "Company"), which, prior to September 24, 2004, was a closely held

Delaware corporation located in Elmira, New York.  Plaintiffs sold all of their shares of

Schweizer (the "Shares") to Sikorsky Aircraft Corporation ("Sikorsky" or "Buyer") pursuant to a

Stock Purchase Agreement dated August 26, 2004 (the "Agreement" or "Stock Purchase

Agreement").

2.      Plaintiffs Leslie E. Schweizer ("Les"), W. Stuart Schweizer ("Stuart"),

and Paul H. Schweizer ("Paul") joined the Company in 1970, 1972, and 1977, respectively.

They are the sons of the first generation owners and executives of Schweizer.  By 1983, they had

become Schweizer's majority shareholders and its executive officers.  Starting in 1983, the position of president was rotated annually among the three until 2002, when it was decided that Paul would remain President.  Paul, Stuart, and Les jointly made all major corporate decisions for Schweizer.

3. Paul's functional responsibilities at Schweizer included marketing and sales of proprietary products (including surveillance aircraft), business development, and finance and accounting.  He is a resident of Elmira, New York.

4. Stuart's functional responsibilities at Schweizer included manufacturing support and operations (including assignment of manufacturing personnel), human resources (including labor relations), and subcontract sales and program management.  In particular, together with Les, he was responsible for the RU-38B Program.  He is a resident of Pine City, New York.

5. Les's functional responsibilities at Schweizer included engineering (including design and testing of Schweizer's proprietary products), investigation and disposition of product liability claims, and quality control systems and operations.  In particular, together with Stuart, he was responsible for the RU-38B Program.  He was also responsible for the investigation and management of Schweizer's defense of the Kelly/Landy product liability cases and the Remcho product liability claim.  He is a resident of Cayuta, New York.

6. Plaintiff Kawada Industries, Inc. ("Kawada") is a Japanese corporation with its principal place of business in Tokyo, Japan.  In 1992, Kawada purchased a 25% interest in Schweizer.

## Defendant Sikorsky Aircraft Corporation

7.      Sikorsky is a Delaware corporation with its principal place of business in Stratford, Connecticut.  In 2009, Sikorsky's sales were $6.3 billion.  Sikorsky is wholly owned by United Technologies which had total sales of $52.9 billion in 2009.

8.      Sikorsky purchased Plaintiffs' Shares of Schweizer pursuant to the Stock Purchase Agreement on or about September 24, 2004.

9.      At the time of the purchase, Sikorsky promoted itself as a world leader in the design and manufacture of military helicopters and other advanced helicopters.  Sikorsky's military helicopters were flown by trained military pilots and its commercial helicopters were primarily flown by experienced professional pilots.

## Schweizer Aircraft Corp.

10.      Initially founded in 1937 as Schweizer Metal Aircraft Company in Peekskill, New York by Ernest Schweizer (father of Les) and Paul A. Schweizer, the Company was relocated to Chemung County, New York and reincorporated in 1939.  Ernest and Paul A. Schweizer were joined by their younger brother William Schweizer (father of Paul and Stuart) in 1941.

11.      By September 24, 2004, the Closing Date[1] under the Agreement, Schweizer had produced nearly 6,000 aircraft and had grown to become an industry leader in the design and manufacture of diverse proprietary aviation products, including manned and unmanned light helicopters, covert reconnaissance aircraft, sailplanes and agricultural aircraft.  It also manufactured subcontract components for major aerospace contractors (including Sikorsky)

---

[1] Capitalized terms used in this Amended Complaint (but not otherwise defined in this Amended Complaint) have the same meaning as in the Agreement.

and the United States Government.  Schweizer's light helicopters were routinely flown by recreational and/or less experienced helicopter pilots and by students learning how to fly helicopters, but were also flown by experienced pilots.

12.     Schweizer had a highly experienced, knowledgeable, hands on management team under the executive direction of Paul, Stuart and Les.

13.     At the time Plaintiffs sold their Shares to Sikorsky in September, 2004, Schweizer had 431 employees, all working at its Big Flats, New York facility, including approximately 45 engineering personnel and 264 tooling, prototype, fabrication and assembly workers.

### Sikorsky Offer and Letter of Intent

14.     In September 2003, Sikorsky approached Schweizer about a possible purchase of the Company.  During the late fall of 2003 and winter of 2004, several meetings were held between high level management people in both companies.  In the initial meetings, the principle participants were Paul and Dean Borgman, President of Sikorsky.  Some of the most significant discussions centered around the vision that Paul, Stuart and Les had for the future of the Company, how Sikorsky's purchase of the Company would facilitate and enhance that vision, and how that vision fit into Sikorsky's business objectives.

15.     In March 2004, Schweizer began providing Sikorsky with the substantial information and documentation Sikorsky requested, as Sikorsky considered the purchase of the Company.

16.     After multiple meetings between Sikorsky management and Paul, Stuart and/or Les, and a review of the substantial information and documentation provided to it,

Sikorsky finally offered to pay $22-26 million for Schweizer -- $12 million in cash at Closing under the Agreement and $10-14 million in deferred and contingent payments.

17.     Although other prospective purchasers had expressed an interest in buying the Company, Plaintiffs agreed to sell the Company to Sikorsky -- both because the purchase price was acceptable but, equally as important, because Sikorsky's vision for Schweizer was most closely aligned with that of Paul, Stuart and Les, the individual Plaintiffs.

18.     Sikorsky's vision for Schweizer was similar to Plaintiffs' -- Schweizer would become a subsidiary of Sikorsky, but would remain an independent company run by Paul, Stuart and Les, who would continue to have day to day responsibility for its management and its operations during a three-year transition period.

19.     Sikorsky told Plaintiffs and Schweizer's employees that it valued, and did not intend to change, Schweizer's culture, company name, or location; that reductions in Schweizer's work force were not being contemplated; and that Schweizer would not become a "mini-Sikorsky," but would remain a low cost, agile, vertically integrated company, with a broad range of manufacturing and design capabilities.

20.     It was critical to Paul, Stuart and Les that they continue to run Schweizer during that three-year transition period, so that the Plaintiffs, as selling shareholders of Schweizer, would have the best chance to receive the deferred and contingent payments they were being asked to agree to.  Likewise, Sikorsky acknowledged that it was critical to the success of Schweizer that Paul, Stuart and Les continue to run the Company during the three-year transition period, and if they did not agree to do that, Sikorsky told them it would not proceed with a purchase of the Company.

21.     Sikorsky also told Paul, Stuart and Les that its product liability philosophy was the same as Schweizer's:  investigate each claim thoroughly, pay those claims properly attributable to defect or failure in the company's products and aggressively defend those claims where there was no product defect or failure.

22.     On April 30, 2004, Schweizer and Sikorsky signed a non-binding letter of intent and Sikorsky then began additional, extensive due diligence of Schweizer.

**Sikorsky Investigates the Kelly/Landy and Remcho Product Liability Claims**

23.     As a part of due diligence, Schweizer provided Sikorsky with copies of its files relating to Remcho (a potential product liability claim arising from the crash of a Schweizer Model 300C helicopter in California in January, 2003) and Kelly/Landy (product liability claims resulting from the crash of a Schweizer Model 300CB helicopter in New Jersey in August, 2002).

24.     Included in the Schweizer files provided to Sikorsky were accident investigation reports generated by Schweizer employees who visited the crash sites after the accidents.  Those reports indicated that neither accident was the result of a product defect or failure in the helicopters.

25.     Also available to Sikorsky were post-crash investigative reports prepared by the National Transportation Safety Board ("NTSB").  The NTSB report of Remcho (#LAX03FA060) (the "Remcho NTSB Report") concluded that the probable cause of the accident was loss of power for undetermined reasons and failure of the pilot to maintain proper rotor r.p.m.  The report found no product defect or failure causing the accident.  The NTSB report of Kelly/Landy (#NYC02FA171) (the "Kelly/Landy NTSB Report") likewise found no product defect or failure causing the accident.  Instead, it concluded that the probable cause of

the accident was failure of the flight instructor (Landy) to properly react to a low rotor r.p.m.
situation during a training flight.

26.    Sikorsky learned from its due diligence that Schweizer's product liability
philosophy was to investigate accidents thoroughly, settle those claims properly attributable to
product defect or failure (which was almost never the case) and, where accidents were caused by
pilot error or other cause not related to product defect or failure, refuse to settle and fight the
claims in court for so long as necessary.  Sikorsky also learned from its due diligence that Les
was the very hands-on leader of the Schweizer team responsible for the investigation, analysis
and defense of product liability claims and was an expert in helicopter design and engineering.

27.    Finally, Sikorsky learned from its due diligence that if Schweizer found
that a helicopter defect or failure was the cause of an accident, Schweizer aggressively and
proactively addressed the design or manufacturing problem which caused the defect or failure.

### Sikorsky Investigates the RU-38B Program

28.    During due diligence, Sikorsky was provided with information relating to
the RU-38B Program.

29.    The RU-38B was a covert surveillance aircraft being built by Schweizer
for a United States Government agency.  The contract for the RU-38B was a fixed price contract,
providing for Schweizer to build and deliver three RU-38B's for $12.8 million.

30.    In December 2003, Schweizer did a thorough cost-to-completion analysis
of the RU-38B Program, projecting a cost overrun in excess of $1 million and recognizing that
overrun as a loss in December 2003.  In May 2004 (four months before the Closing), Schweizer
updated its cost-to-completion analysis, projecting an additional cost overrun and recognizing
that overrun as an additional loss in May 2004.

31.     Sikorsky knew that Schweizer had accounted for these losses and other RU-38B cost overruns prior to Closing.

32.     The estimated cost to complete the RU-38B Program was based, as it had to be, on the contract in effect on June 30, 2004 and Schweizer's historic costs at that time, as well as Les and Stuart's continuing responsibility for completion of the RU-38B Program.

## The Stock Purchase Agreement

33.     On or about August 26, 2004, the parties entered into a Stock Purchase Agreement to document the terms on which Sikorsky was buying Plaintiffs' Shares of Schweizer.  A true and correct copy of the Agreement (excluding Schedules) is attached as Exhibit A.

34.     Under the Agreement, Sikorsky agreed:  (1) to make a $12 million cash payment for the Shares (referred to in Section 1.3(a) of the Agreement as the Closing Date Payment); (2) subject to the conditions in Article VI, to pay a Deferred Payment Amount (as provided in Section 1.3(c) of the Agreement) equal to $4 million less the total of any Damages from any resolved Indemnity Claim and Indemnity Matter plus any anticipated Damages from any open Indemnity Claims and Indemnity Matters thirty-six (36) months after the Closing Date (including cost overruns on the RU-38B Program) plus the Interest thereon; and (3) subject to the conditions in Article VI, to pay the Contingent Payment Amount (as provided in Section 1.3(b) of the Agreement) less any amounts debited in respect of product liability claims in excess of the reserve on Schweizer's December 31, 2003 Balance Sheet plus the Interest thereon.

## The Employment Agreements with Paul, Stuart and Les

35.     The Agreement also required, as a condition to closing, that Paul, Stuart and Les enter into employment agreements with Sikorsky, which they did.

36.     Under Paul's employment agreement, he was to continue in his position as President of Schweizer for three years after the Closing Date.  His post-Closing responsibilities as President of Schweizer were to be substantially similar to his pre-Closing responsibilities as President of Schweizer.  A true and correct copy of Paul's employment agreement is attached hereto as Exhibit B.

37.     Under Stuart's employment agreement, he was to continue as the Vice President, Manufacturing of Schweizer for three years after the Closing Date.  His post-Closing responsibilities as Vice President, Manufacturing of Schweizer were to be substantially similar to his pre-Closing responsibilities as Vice President, Manufacturing of Schweizer.  In particular, prior to Closing, Stuart was responsible for the assignment of manufacturing personnel working on the RU-38B Program.  A true and correct copy of Stuart's employment agreement is attached hereto as Exhibit C.

38.     Under Les's employment agreement, he was to continue as the Vice President, Engineering and Quality Control of Schweizer for three years after the Closing Date.  His post-Closing responsibilities as Vice President, Engineering and Quality Control of Schweizer were to be substantially similar to his pre-Closing responsibilities as Vice President, Engineering and Quality Control of Schweizer.  In particular, prior to Closing, Les was responsible for the assignment of engineering personnel, including program management of and employees working on the RU-38B Program.  He was also responsible for management of the defense of Remcho and Kelly/Landy, as well as other product liability claims.  A true and correct copy of Les's employment agreement is attached as Exhibit D.

## Section 4.19(a) and Article VI:  Plaintiffs' Indemnification of Sikorsky for Product Liability Claims (Including Remcho and Kelly/Landy)

39.     In Section 4.19(a), Plaintiffs represented to Sikorsky that its post-Closing products liability claims resulting from injury or property damage occurring prior to Closing would not exceed the amount reserved against on Schweizer's December 31, 2003 Balance Sheet.

40.     On Schedule 4.19(a), Plaintiffs identified its history for products liability claims against Schweizer for the previous five years.  Schedule 4.19(a) included two pending claims:  Kelly and Landy.  Schedule 4.12 (Legal Proceedings) also identified Kelly and Landy as "Pending Litigation" and identified Remcho under "Potential Litigation" because legal action in Remcho had not yet been initiated.

41.     Section 6.6 of the Agreement also provided that Les and the other Plaintiffs would remain involved in managing accident investigation and product liability defense (including Remcho and Kelly/Landy).  This was in accord with Les's employment agreement, which provided that his post-Closing responsibilities at Schweizer would be substantially similar to his pre-Closing responsibilities at Schweizer, which included the hands-on management of, and responsibility for, the investigation, analysis and disposition of Remcho and Kelly/Landy, as well as the other product liability claims.

42.     The product liability reserve on Schweizer's December 31, 2003 Balance Sheet was $1 million, which was more than enough to accommodate disposition of Remcho and Kelly/Landy, based on Les's investigation of the accidents, his continuing responsibility for Schweizer's product liability claims, Schweizer's 21-year history of successfully managing the defense of product liability claims and the critical fact that the NTSB had investigated both

accidents and found no evidence they were caused by any defect or failure in the Schweizer helicopters.

43.     As provided in Section 1.3(b) and subject to the conditions in Article VI of the Agreement, if the product liability reserve was not large enough, any shortfall was to be paid from the Contingent Payment Amount.

### Sections 4.29 and Article VI:  The RU-38B Program

44.     In Section 4.29 and on Schedule 4.29, Plaintiffs represented that the costs to complete the RU-38B Program would not exceed $13,752,747, the amount set forth in Schedule 4.29, and that costs to complete the Program were appropriately reserved on a June 30, 2004 interim financial statement and a Pre-Closing Balance Sheet provided by Schweizer to Sikorsky.  Prior to Closing, and as disclosed to and known by Sikorsky, Schweizer accounted for cost overruns on the RU-38B Program by recording the same as losses immediately in the period when identified.

45.     Based on Paul, Stuart and Les's combined 93 years of experience at Schweizer, Stuart's continuing responsibility for Schweizer's manufacturing operations (including assignment of personnel working on the RU-38B Program) and Les's continuing responsibility for Schweizer's design and engineering and program management functions (including the RU-38B Program), in both cases, as provided in their employment agreements, Paul, Stuart and Les were confident that Schweizer's highly skilled, design, engineering and production employees working on the RU-38B Program would be able to complete the Program on time and within budgeted $13.8 million cost plus cost overruns accounted for by Schweizer prior to Closing (the "Budgeted Cost").

46.     As provided in Section 1.3(c) and subject to the conditions in Article VI of the Agreement, if the RU-38B Program was not completed within the Budgeted Cost, any cost overruns were to be paid from the Deferred Payment Amount.

### Sikorsky Appoints General Manager, Who Usurps Management Control of Schweizer After Closing

47.     In July 2004, Paul, Stuart and Les learned that Sikorsky was appointing Randy Simpson as onsite General Manager at Schweizer to lead the integration of Schweizer and Sikorsky and to be Schweizer's main reporting contact with Sikorsky.

48.     Nonetheless, Sikorsky intended, but did not inform Paul, Stuart or Les, that Simpson would take over and run Schweizer after the Closing Date.  He was given the authority to make unilateral decisions, even though the employment agreements of Paul, Stuart and Les provided that they would run the Company after Closing.  Sikorsky also did not inform Paul, Stuart, or Les that Simpson would re-direct the efforts and energies of Schweizer to new projects that were important to Sikorsky, deemphasizing existing Schweizer projects, including the RU-38B Program.

49.     After Closing, what Sikorsky intended came to pass:  Simpson took over active management of Schweizer, and began to make the important decisions – decisions Paul, Stuart and Les reasonably thought they would make, based on their employment agreements and what Sikorsky told them prior to Closing.  In particular, it was Simpson, not Paul, Stuart or Les, who made key decisions involving the RU-38B Program and the management and settlement of Remcho and Kelly/Landy.

50.     Under Simpson's management, Schweizer became a "mini-Sikorsky":  its lean organizational structure was burdened with additional levels of costly management

personnel; Stuart and other key employees were assigned, on a "highest priority basis," to Sikorsky's Military Derivatives Completion Center (MDCC) project, for the production of Sikorsky Hawk Helicopters, and were not replaced.  Likewise, Les and Schweizer's best and most experienced engineers were assigned, on "a highest priority basis," to work on the design and engineering of Sikorsky's X-2 Technology Demonstration helicopter.  The prototype, tooling, design and engineering functions related to the RU-38B Program were left to an understaffed work force comprised primarily of inexperienced mechanics and engineers, working without knowledgeable management or leadership.  As a result, costs increased significantly and efficiency plummeted.  By 2007, direct labor hours and direct labor dollars had increased by more than 50% from 2004 levels, as had G&A Overhead; direct labor costs and manufacturing overhead had more than doubled.  Additionally, management of Remcho and Kelly/Landy was left to lawyers and outside experts who managed the cases without heeding input from Les, and with little or no concern for costs.

51.     If Paul, Stuart and Les had known that they would not have management control of Schweizer during the three-year transition period after Closing, they would not have agreed to deferred and contingent payments as part of the purchase price for the sale of the Shares to Sikorsky.

## The RU-38B Program:  The Deferred Payment Amount

52.     Sikorsky knew that if the actual cost to complete the RU-38B Program exceeded the Budgeted Cost, the $4 million Deferred Payment Amount would be reduced on a dollar-for-dollar basis by the amount of any cost overruns.  Thus, Sikorsky demonstrated no real interest in completing the RU-38B Program in accordance with the Budgeted Cost, because

under the Stock Purchase Agreement, the first $4 million in cost overruns was being paid from the Deferred Payment Amount which otherwise would have been paid to Plaintiffs.

53.     Based on decisions made solely by Sikorsky, many of Schweizer's most experienced and skilled employees who were working on the RU-38B Program before Closing were re-assigned after Closing to work on the X-2 Technology Demonstration, MDCC, and other projects which were of greater importance to Sikorsky.  Additionally, a hiring freeze was implemented by Sikorsky in the Fall 2005, leaving an understaffed work force comprised primarily of less experienced and less skilled Schweizer employees to complete the RU-38B Program, without knowledgeable management or leadership.  As a result of these actions taken by Sikorsky, the costs incurred in attempting to complete the RU-38B Program far exceeded the amount Plaintiffs had represented and warranted would be sufficient.

54.     If Stuart and Les had retained responsibility for the RU-38B Program, it would have been completed on time and within the Budgeted Cost.

55.     After Closing, labor and material costs were improperly charged to the RU-38B Program, thereby improperly increasing the costs to complete the Program. Specifically, material costs incurred for other programs were  charged to the RU-38B Program and labor and material costs incurred for RU-38B supplemental contracts entered into after Closing were improperly charged as costs of the RU-38B Program as it existed on the date of Closing.

56.      In determining the Purchase Price Adjustment provided for in Section 1.4 of the Agreement, Sikorsky reduced the "Net Asset Value of the Company" (and the amount it paid to Plaintiffs) by $146,000, to account for cost overruns on the RU-38B Program.  Sikorsky

then "double dipped" by including the same $146,000 as a cost of the RU-38B Program, thereby reducing the Deferred Payment Amount paid to Plaintiffs by the same amount.

57.     After Closing, Sikorsky was in sole control of, and had sole access to, the books and records of Schweizer reflecting the costs charged to the RU-38B Program.

58.     By letter dated September 21, 2007, Sikorsky gave Plaintiffs written notice that the cost overruns on the RU-38B Program were $2,840,848, retained that amount, and thereafter paid Plaintiffs $1,159,152, constituting the balance of the Deferred Payment Amount, plus Interest in the amount of $243,953.

59.     The September 21, 2007 letter failed to provide "in reasonable detail" the "factual basis" for Sikorsky's calculation of the cost overruns on the RU-38B Program as required by Section 6.5(a) of the Agreement.

60.     When Plaintiffs asked Sikorsky to provide reasonable detail of the claimed $2,840,848 cost overrun on the RU-38B Program, Sikorsky failed and/or refused to do so.

**Remcho and Kelly/Landy:  The Contingent Payment Amount**

61.     The Remcho litigation involved a crash of a Schweizer Model 300C helicopter in California in January, 2003.  Mr. Remcho died in the accident.  Schweizer's potential liability was fully reserved on Schweizer's December 31, 2003 Balance Sheet, in accordance with Schweizer's 21-year history of successfully managing the defense of helicopter products liability claims and the Remcho NTSB Report finding that the probable cause of the accident was loss of power for undetermined reasons and failure of the pilot to maintain proper rotor r.p.m.  Litigation was commenced in January 2005.

62.     The Kelly/Landy litigation involved a crash of a Schweizer Model 300CB helicopter in New Jersey in August, 2002.  The helicopter was being used by a flight training

school.  Mr. Kelly (the student pilot) suffered a serious back injury.  Mr. Landy (his flight instructor) was not seriously injured.  Litigation was on-going on September 24, 2004, the Closing Date.  The potential liability was fully reserved on Schweizer's December 31, 2003 Balance Sheet, in accordance with Schweizer's 21-year history of successfully managing helicopter product liability claims and the Kelly/Landy NTSB Report finding that the probable cause of the accident was the failure of the flight instructor to properly react to a low rotor r.p.m. situation.

63.     Sikorsky had done due diligence of Remcho and Kelly/Landy and learned that the NTSB had investigated both accidents and did not assign defect or failure in the helicopters as a probable cause of either accident.  They also learned that Schweizer employees had also investigated the accidents and, likewise, found no defect or failure in the helicopters.

64.     Sikorsky did know, however, that, because Schweizer was to remain a separate corporate entity after closing, it was unlikely that plaintiffs in either Kelly/Landy or Remcho would be able to look to the assets of either Sikorsky or its parent corporation, United Technologies, to satisfy any judgment against Schweizer.

65.     Sikorsky also knew that Schweizer was self insured for product liability claims prior to Closing and that Schweizer's product liability claims expense for the 21-year period from 1983 to 2004 was barely $2 million in total.

66.     Nevertheless, Sikorsky caused Schweizer, after Closing, to increase Schweizer's products liability reserve on its balance sheet from $1 million to $27.65 million: $20.3 million for Remcho and all or most of the balance of the reserve for Kelly/Landy.

67.     Although Sikorsky had limited knowledge about Schweizer's Model 300C helicopter, it learned, prior to November 2007, that:  (i) the NTSB had investigated the Remcho

accident and did not find any failure or defect in the Model 300C helicopter causing the accident; (ii) the Remcho NTSB Report found that the probable cause of the accident was loss of power for undetermined reasons and failure of the pilot to maintain proper rotor r.p.m.; (iii) although Remcho was a relatively experienced pilot of fixed wing aircraft, he was a relative novice in piloting helicopters; and (iv) Remcho had a known medical history of heart problems. Sikorsky also knew that Remcho's counsel was unable to come up with a viable theory as to how the Remcho accident could have been caused by a defect or failure in the helicopter.

68.     Sikorsky also knew that Les was an expert in the design and engineering of the Model 300C helicopter and was knowledgeable about the Remcho accident, and they knew of Schweizer's successful 21-year history, under Les's management, in limiting Schweizer's product liability to less than $100,000 per year.

69.     Nonetheless, in December 2007, Sikorsky decided, without soliciting or heeding input from Les, to settle the Remcho litigation for an amount which is believed to be approximately $4.5 million.

70.     Sikorsky was not interested in settling Remcho in the most economical way.  What Sikorsky was interested in doing was to settle Remcho:  (1) using all (if necessary) of the $6 million Contingent Payment Amount which would otherwise have been paid to Plaintiffs; and (2) reversing the $20.3 million product liability reserve for Remcho on Schweizer's opening balance sheet, thereby artificially increasing Schweizer's fourth quarter 2007 earnings by $14.95 million.

71.     In mid 2008, Sikorsky agreed to settle Kelly/Landy for an amount which is believed to be approximately $4 million.

72.     Like Remcho, Kelly/Landy was settled even though the Kelly/Landy NTSB Report did not find any failure or defect in the Model 300BC helicopter causing the accident and even though counsel for Kelly had been unable to come up with a viable theory as to how the accident could have been caused by a product defect or failure in the helicopter.  And like Remcho, the decision to settle was made without soliciting or heeding input from Les.

73.     Schweizer made no design or manufacturing changes to the Model 300C or Model 300BC helicopters piloted by Remcho and Kelly because there were no defects or failures to remedy.

74.     If Les had retained management responsibility for Remcho and Kelly/Landy, the cost of settling those product liability claims (including reasonable attorneys fees) would have been less than the amount reserved against on Schweizer's December 31, 2003 Balance Sheet.

75.     Furthermore, although expressly required to do so by Section 6.4(b)(2) of the Agreement, Sikorsky did not deliver (and to this date has not delivered) to Plaintiffs' Sellers' Agent written notice of the Remcho, Kelly and Landy product liability claims within sixty (60) days after the Remcho, Kelly and Landy claims were settled.

76.     Sikorsky was not entitled to debit any amount from the Contingent Payment Amount and the Interest thereon.

77.     Sikorsky has not paid the Contingent Payment Amount and the Interest thereon to Plaintiffs' Sellers' Agent as required by Section 1.3(b) of the Agreement.

**FIRST CAUSE OF ACTION**

78.     Plaintiffs repeat and reallege the allegations of paragraphs 1 - 77 hereof.

79.    Because Sikorsky failed to timely deliver to Plaintiffs' Sellers' Agent written notice of the Remcho, Kelly and Landy product liability claims within sixty (60) days after the Remcho, Kelly and Landy claims were settled as required by Section 6.4(b)(2), it was not entitled to debit any of the Contingent Payment Amount and Interest thereon, and was obligated to pay the Contingent Payment Amount and the Interest thereon to Plaintiffs' Sellers' Agent within sixty (60) days after the Remcho, Kelly and Landy claims were settled.

80.    Sikorsky failed to pay the Contingent Payment Amount and the Interest thereon to Plaintiffs' Sellers' Agent within sixty (60) days after the Remcho, Kelly and Landy claims were settled, thereby breaching the Agreement.

## SECOND CAUSE OF ACTION

81.    Plaintiffs repeat and reallege the allegations of paragraphs 1 - 80 hereof.

82.    Section 6.6 of the Agreement expressly required Sikorsky to work together with Plaintiffs and cooperate with them in pursuing the defense of the Kelly product liability claim.

83.    Section 6.6 of the Agreement expressly required Sikorsky to work together with Plaintiffs and cooperate with them in pursuing the defense of the Landy product liability claim.

84.    Section 6.6 of the Agreement expressly required Sikorsky to work together with Plaintiffs and cooperate with them in pursuing the defense of the Remcho product liability claim.

85.    Sikorsky failed to work together with Plaintiffs and cooperate with them in pursuing the defense of the Kelly, Landy and Remcho product liability claims, thereby breaching the Agreement.

86.     As a result of this breach, Sikorsky needlessly settled the Kelly, Landy and Remcho claims for more than the amount reserved against on Schweizer's December 31, 2003 Balance Sheet, was not therefore entitled to debit any of the Contingent Payment Amount and the Interest thereon and was obligated to pay the Contingent Payment Amount and the Interest thereon to Plaintiffs' Sellers' Agent, which Sikorsky failed to do.

### THIRD CAUSE OF ACTION - DISMISSED

### SEE STIPULATION OF PARTIES REGARDING THIRD CAUSE OF ACTION

### FOURTH CAUSE OF ACTION

87.     Plaintiffs repeat and reallege the allegations of paragraphs 1 - 86 hereof.

88.     The Agreement is governed by and construed in accordance with the laws of the state of New York without regard to its conflicts of laws doctrines.

89.     Under New York law, it was an implied term of the Agreement that Sikorsky act in good faith and make reasonable and diligent efforts to complete the RU-38B Program within the Budgeted Cost.

90.     Sikorsky breached this implied term of the Agreement as set forth above and the cost to complete the RU-38B Program needlessly exceeded the Budgeted Cost by $2,840,848, which amount Sikorsky retained from the Deferred Payment Amount.

91.     Sikorsky was not entitled to retain any of the $2,840,848 from the Deferred Payment Amount, but was obligated to pay said amount to Plaintiff's Seller's Agent, which Sikorsky failed to do.

### FIFTH CAUSE OF ACTION

92.     Plaintiffs repeat and reallege the allegations of paragraphs 1 – 91 hereof.

93.     Under the Agreement, Sikorsky was obligated to pay Plaintiffs the

Deferred Payment Amount subject to reduction for Damages claimed by Sikorsky for an Indemnity Matter, as set forth in a notice "specify[ing] the factual basis of the claim in reasonable detail."

94.     Because Sikorsky's notice failed to specify the factual basis of the claim in reasonable detail as required by Section 6.5 of the Agreement, Sikorsky is not entitled to retain all or any portion of the Deferred Payment Amount and was obligated to pay the amount retained to Plaintiffs' Sellers' Agent pursuant to the Agreement.

## SIXTH CAUSE OF ACTION

95.     Plaintiffs repeat and reallege the allegations of paragraphs 1 – 94 hereof.

96.     Sikorsky improperly calculated the costs of the RU-38B Program and, as a result, the amount of the Deferred Payment Amount paid to Plaintiffs was improperly reduced.

97.     If the costs of the RU-38B Program had been properly calculated, Sikorsky would not have been entitled to retain any of the $2,840,848 from the Deferred Payment Amount, but would have been obligated to pay said amount to Plaintiffs' Sellers' Agent, which Sikorsky failed to do.

WHEREFORE, Plaintiffs demand judgment against Sikorsky as follows:

1.     On the first cause of action, in the amount of the Contingent Payment Amount and the Interest thereon;

2.     On the second cause of action, in the amount of the Contingent Payment Amount and the Interest thereon;

3.     On the fourth cause of action, in the amount of $2,840,848;

4.      On the fifth cause of action, a declaration that Sikorsky is not entitled to retain all or any portion of the Deferred Payment Amount and was obligated to pay the amount retained to Plaintiffs' Sellers' Agent pursuant to the Agreement.

5.      On the sixth cause of action, in the amount of $2,840,848.

Together with interest thereon, attorneys fees and expenses, costs and disbursements, and such other and further relief as to the Court seems just and proper.

DATED:      Buffalo, New York
            September 12, 2012

PHILLIPS LYTLE LLP


By___/s/ Patricia A. Mancabelli_____
Edward S. Bloomberg, Esq.
Patricia Mancabelli, Esq.
Attorneys for Plaintiffs
3400 HSBC Center
Buffalo, New York 14203-2887
(716) 847-8400

Doc #01-2595647.7