UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

PAUL H. SCHWEIZER, W. STUART
SCHWEIZER, LESLIE E. SCHWEIZER and
KAWADA INDUSTRIES, INC.,

          Plaintiffs,

    -vs-

SIKORSKY AIRCRAFT CORPORATION,

         Defendant.

───────────────────────────────

**DECISION and ORDER**
**No. 6:10-CV-6547(MAT)**

## I.   Introduction

Paul H. Schweizer, W. Stuart Schweizer, and Leslie E. Schweizer, along with Kawada Industries, Inc. (collectively, "Plaintiffs") instituted this action against Sikorsky Aircraft Corporation alleging claims of breach of contract and breach of the implied duty of good faith and fair dealing. Presently before the Court are the parties' cross-motions for summary judgment.

## II.  Factual Background

Plaintiffs are former shareholders of Schweizer Aircraft, a closely-held aircraft manufacturer based in Elmira, New York. After extensive negotiation regarding terms, Plaintiffs and Defendant executed a Stock Purchase Agreement ("SPA") [#50-1] on August 26, 2004, pursuant to which Plaintiffs sold, and Sikorsky purchased, all of the outstanding capital stock of Schweizer Aircraft. On September 23, 2004, the Closing Date, Sikorsky paid Plaintiffs

$12 million. In 2007, Plaintiffs received a supplemental payment from Sikorsky of $1,159,152, plus interest.

In the SPA, the parties had agreed that a substantial portion of the purchase price would be deferred and contingent in order to provide Sikorsky with security to support certain contractual indemnity obligations owed by Plaintiffs, including those related to then-pending product liability claims and to the completion costs for development of the RU-38B, a fixed wing surveillance aircraft ("the RU-38B Program"). Plaintiffs' obligations under the SPA included their fulfillment of certain warranties, namely, that Schweizer Aircraft had adequate financial reserves to cover the product liability lawsuits and to complete the RU-38B Program. However, the product liability claims ultimately settled for more than the amount reserved by the Company, and the RU-38B program ran over budget. Sikorsky determined that Plaintiffs were in breach of their representational warranties, and accordingly reduced the deferred and contingent payment amounts payable to Plaintiffs. Believing that Defendant had incorrectly calculated the deferred and contingent payments, Plaintiffs instituted this action.

## III. Procedural History

On February 8, 2011, this Court issued a Decision and Order [#16][1] granting Defendant's Motion to Dismiss the Third Cause of

---

[1]

Numerals in brackets refer to document entries on the CM/ECF docket sheet for this case.

-2-

Action and denying Defendant's motion to dismiss the Second and Fourth Causes of Action. After extensive discovery, Plaintiffs filed an Amended Complaint [#38] on September 19, 2012. In their first cause of action, Plaintiffs allege that Sikorsky breached the SPA by failing to provide timely written notice before deducting the costs of defending and settling the product liability claims from the Contingent Payment Amount. In their second cause of action, Plaintiffs claim that Sikorsky failed to work together with Plaintiffs in the defense of the two product liability claims and greatly overpaid when settling those cases, to Plaintiffs' financial detriment. Plaintiffs' fourth cause of action alleges that Sikorsky breached the implied covenant of good faith by failing to complete the RU-38B Program within the amount that the Plaintiffs represented would be required to complete the program on a breakeven basis. Plaintiffs' fifth cause of action asserts that, before deducting the RU-38B Program cost overruns from the Deferred Payment Amount, Sikorsky failed to provide sufficiently detailed notice regarding the basis for these overruns. Finally, Plaintiffs' sixth cause of action alleges that Sikorsky improperly calculated the total costs of the RU-38B Program and deducted too large a sum from the Deferred Payment Amount owed to Plaintiffs.

On December 12, 2013, Defendant filed a Motion for Summary Judgment [#47] and supporting Memorandum of Law ("Def's MOL") [#47-1]. On January 29, 2014, Plaintiffs filed a Cross-Motion for

Partial Summary Judgment [#55, #73] with exhibits and a supporting Memorandum of Law ("Pl's MOL") [#72]. Defendant filed a reply brief ("Def's Reply") [#76] on February 28, 2014. Plaintiffs filed a reply brief ("Pls' Reply") [#77] on March 14, 2014.

For the reasons discussed below, Defendant's Motion for Summary Judgment is granted, Plaintiffs' Cross-Motion for Partial Summary Judgment is denied, and the Amended Complaint is dismissed.

## III. General Legal Principles

### A.    Summary Judgment Standard

Summary judgment may be granted when "there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A court reviewing a request for summary judgment is required to resolve all ambiguities and draw all inferences in favor of the non-moving party, and must view any inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions in the light most favorable to the nonmoving party. Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999) (citing Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995); further citations omitted)).

The mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. Knight v. United States Fire Ins. Co., 804 F.2d 9, 11-12 (2d Cir. 1986). Rather, the

disputed issues of fact must be "material to the outcome of the litigation," Knight, 804 F.2d at 11, and must be underpinned by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). With respect to materiality, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**B.   Contract Interpretation**

The SPA specifies that New York law applies, and the parties do not dispute this. In reviewing a written contract, the court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citation omitted). The court "must give 'unambiguous provisions of an insurance contract . . . their plain and ordinary meaning.'" 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011) (quotation omitted). When interpreting disputed language, the court must consider all pertinent provisions in the contract and seek to harmonize them, if possible. Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000)

(citing <u>Reda v. Eastman Kodak Co.</u>, 233 A.D.2d 914, 915 (4th Dep't 1996)).

"If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment." <u>International Multifoods Corp. v. Commercial Union Ins. Co.</u>, 309 F.3d 76, 83 (2d Cir. 2002) (citations and quotation marks omitted). If, however, "the resolution of a dispute turns on the meaning of an ambiguous term or phrase[,]" <u>Federal Ins. Co. v. American Home Assur. Co.</u>, 639 F.3d 557, 567 (2d Cir. 2011) (citations omitted), summary judgment is not appropriate. <u>Id.</u> "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." <u>Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884, 889 (2d Cir. 1990).

## V.   Discussion

### A.   First Cause of Action: Failure to Provide Written Notice of the Deduction of the PL Litigations from the CPA

Plaintiffs' first cause of action involves Section 1.3(b), which allows for a reduction in the CPA due to Plaintiffs' breach of the representational warranty in Section 4.19(a) and Schedule 4.19(a) for "Damages paid by [Defendant] for product liability claims for accidents occurring prior to Closing". In Section 4.19(a) and Schedule 4.19(a), Plaintiffs warranted that Sikorsky would not be liable for pre-Closing product liability exceeding the

amount Schweizer Aircraft had reserved on its Balance Sheet (i.e., $1 million). See SPA, § 4.19(a), Schedule 4.19(a). Two significant product liability lawsuits were pending against Schweizer Aircraft as of the Closing Date, "the Remcho Litigation" and "the Kelly/Landy Litigation" (collectively, "the PL Litigations"). The CPA, set forth in Section 1.3(b), was the indemnification mechanism for the costs of the PL Litigations and provided in pertinent part as follows:

> Any earned [CPA] and any applicable Interest payable to the Sellers shall be held by the Buyer until all pending or potential product liability claims for accidents occurring prior to the Closing Date are finally resolved . . . .
>
> Any Damages under Section 4.19(a) paid by Buyer on account of any product liability claim as described in Section 4.19(a) for accidents occurring prior to the Closing Date [the PL Litigations] shall be debited from the earned [CPA] and any earned Interest. . . .

SPA, § 1.3(b) [#50-1].

In December of 2007, Defendant settled the Remcho Litigation for approximately $4.5 million, and in June of 2008, Defendant settled the Kelly/Landy Litigation for $4.03 million. Because the settlement of and expenses related to the Remcho Litigation consumed about $4.47 million of the $5.5 million CPA earned by Plaintiffs[2], Defendant deducted only about $1.03 million of the Kelly/Landy Litigation settlement amount and expenses from the CPA.

---

[2]

This reflects the Remcho Litigation settlement amount of $4.5 million plus legal fees and expenses of $971,835, minus the $1 million reserve on the Schweizer Aircraft Balance Sheet.

The remaining, approximately $4.46 million was absorbed by Schweizer Aircraft.

Plaintiffs assert that these "Damages" are "claims for Buyer Damages", and they therefore fall within subsection (2) of Section 6.4(b)'s requirement of 60 days written notice. Section 6.4(b) provides in relevant part as follows:

> (b) Time Period. Any claim for Buyer Damages sustained by reason of a breach or inaccuracy of any representation or warranty, shall be limited to claims made in a written notice delivered to Sellers' Agent prior to (1) for matters other than matters related to product liability under Section 4.19(a), the third anniversary of the Closing Date and (2) for matters related to products liability under Section 4.19(a), the date sixty (60) days after any such claims are finally resolved or the applicable statutes of limitations have expired for such matters if no claim has been made. . . .

SPA [#50-1], § 6.4(b)(1)-(2).

Plaintiffs argue that the product liability claims referenced in Section 1.3(b), which sets forth the method for calculating the CPA, are "Buyer Damages" to which the notice provision in Section 6.4(b)(2) applies; that Section 6.4(b)(2) requires, as a condition precedent to a request by Sikorsky for indemnification of the product liability claims, 60 days written notice; and that Sikorsky failed to comply with that condition precedent[3] by "fail[ing] to

---

[3]

Plaintiffs have complicated matters by arguing that Section 6.4(b) is both a condition precedent and a condition subsequent. In their first cause of action, they assert that subsection (2) of Section 6.4(b) is a condition precedent requiring literal compliance. Pl's MOL at 16-20. However, in regards to their fifth cause of action, as to which Plaintiffs claim that subsection (1)

timely deliver to Plaintiffs' Sellers' Agent . . . written notice", pursuant to Section 6.4(b)(2), of the product liability claims by which the CPA was reduced, "within sixty (60) days after [such] claims were settled." Amended Complaint ("Am. Compl."), ¶ 60. The parties have cross-moved for summary judgment on this claim.

As noted above, Section 1.3(b) refers to "Damages under Section 4.19(a) paid by Buyer on account of any product liability claim as described in Section 4.19(a) for accidents occurring prior to the Closing Date[.]" SPA, § 1.3(b). Section 6.4(b)(2), on the other hand, refers to "Buyer Damages", which is defined separately from "Damages," compare SPA, § 6.2 with id., pp. 52-53. Plaintiffs argue that the Damages mentioned in Section 1.3(b) are "Buyer Damages" and reason that they fall within Section 6.4(b)(2)'s requirement of 60 days written notice.

---

of Section 6.4(b) applies, Plaintiffs contend that it is a "classic condition subsequent," Pl's MOL at 29 (citing, inter alia, Black's Law Dictionary 334 (9th ed. 2009)). It is axiomatic that a contractual provision cannot be both a condition precedent and a condition subsequent; traditionally, conditions precedent have been treated differently by courts than conditions subsequent. Contrast People v. President & Directors of the Williamsburgh Turnpike Rd. & Bridge Co., 2 Sickels 586, 1872 WL 11728, at *5 (N.Y. 1872) ("The conditions in question in this case were conditions subsequent, and a failure literally to comply with them was not necessarily a cause of forfeiture; a substantial performance was all that was required.") (citation omitted) with Oppenheimer, 86 N.Y.2d at 690-91 ("A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. . . . Express conditions must be literally performed. . . .") (internal citations and quotation marks omitted). Fortunately, the Court need not resolve this question in order to dispose of the parties' motions.

As Defendant observes, Section 1.3(b) uses the phrase "Damages", rather than "Buyer Damages", and there is no basis to infer that the drafters intended otherwise. Accordingly, Defendant argues, Section 6.4(b)(2) does not apply. Defendant also points out that Section 1.3(b) does not contain a notice requirement, and therefore no notice was required before deducting the PL Litigations' costs from the CPA. Even if notice were required, Defendant contends, Plaintiffs had actual notice of the settlement of the PL Litigations, and accordingly were not prejudiced by the lack of notice.

Defendant is correct that Section 1.3(b) does not refer to "Buyer Damages", which is defined separately in Section 6.2, and "Buyer Damages" are not referenced in Section 4.19(a). Also, Section 1.3(b) does not require that notice must be given before the "Damages under Section 4.19(a)" paid with regard to pre-Closing product liability claims are debited from the earned CPA and any earned interest. See id. ("[D]amages under Section 4.19(a) paid by Buyer . . . *shall be debited*. . . .") (emphasis supplied). Thus, Defendant's argument-that it was not required to give written notice before it deducted the "Damages[4] under Section 4.19(a) paid

---

[4]    "Damages" are defined in Article VII (Definitions, Construction), Section 7.1 as

       any loss, demand, claim, allegation, assertion, action
       or cause of action, assessment, damage (including
       incidental and consequential damages), . . . judgment,
       award or settlement, whether or not involving a

by Buyer on account of any product liability claim as described in Section 4.19(a) for accidents occurring prior to the Closing Date"–is consistent with the express terms of the SPA. It also comports with common sense, as claims for "Buyer Damages" (claims "asserted against, imposed upon, resulting to, or incurred or required to be paid by" Sikorsky and its affiliates) would not necessarily have been in existence at the time of Closing and thus would not be known to Plaintiffs; hence, notice of such claims would be required.

Plaintiffs' construction of Section 1.3(b) and Section 6.4(b)(2), however, requires the Court to look outside the language of these sections and interpret terms not expressly or implicitly used in them. First, the Court must find that Section 6.4(b)(2) and Section 1.3(b)–although the former refers to "Buyer Damages" and the latter refers to "Damages paid by Buyer on account of any product liability claim as described in Section 4.19(a)"–are talking about the same thing. Section 6.2 defines "Buyer Damages" as "all Damages . . . directly or indirectly asserted against, imposed upon, resulting to, or incurred or required to be paid by

---

third-party claim, including reasonable legal fees and disbursements of counsel, interest, and all amounts paid in investigation, defense or settlement of any of the foregoing.

SPA, pp. 52-53.

-11-

any Buyer Indemnitee from or in connection with or arising out of"

the following events:

    (a) any breach or inaccuracy of any representation or warranty made by [Plaintiffs] in or in connection with [the SPA]. . . ;

    (b) any breach or nonperformance of any covenant or obligation made by [Plaintiffs] in or connection with [the SPA]. . .; and

    (c) any investigation, defense, settlement, enforcement, litigation or prosecution by [Defendant] . . . [of] any of the foregoing or of any of [Defendant]'s other rights under [the SPA]. . . .

SPA, § 6.2(a)-(c). Included within the definition of "Buyer Indemnitee" is Sikorsky as well as all of Sikorsky's "officers, directors, employees, agents and Affiliates. . . ." SPA, § 6.2. "Affiliates" of a Buyer Indemnitee include, "after the Closing, the Company [i.e., Schweizer Aircraft] and the Subsidiaries. . . ." Id.

    Thus, there are two criteria for "Damages" to be "Buyer Damages". First, they must be, or have been "asserted against, imposed upon, resulting to, or incurred or required to be paid by" any "Buyer Indemnitee." Second, they must have arisen out of one of the three events set out in subsection (a), (b), or (c) of Section 6.2. Turning to the first criterion, Sikorsky is correct that the PL Litigations were "asserted" against Schweizer Aircraft, not Sikorsky or its pre-Closing Affiliates. However, under Section 6.2's definition of Buyer Indemnitee, Schweizer Aircraft–which was the sole defendant in the PL Litigations–became a Sikorsky "Affiliate"

(and thus a "Buyer Indemnitee") after the Closing. Thus, even if the PL Litigations initially were not "asserted against" Sikorsky, as Buyer, it could be said that the settlement amounts and expenses ultimately were "resulting to, or incurred or required to be paid by" a Buyer Indemnitee. However, such a construction is by no means clear.

Turning to the second criterion in the definition of Buyer Damages, Plaintiffs argue that the settlement amounts and defense costs of the PL Litigations, which were deducted from the CPA, fall within subsection (a) of Section 6.2. That is, Plaintiffs argue, they were "asserted against, imposed upon, resulting to, or incurred or required to be paid by any Buyer Indemnitee from or in connection with or arising out of breach or inaccuracy of any representation or warranty made by [Plaintiffs] in or in connection with [the SPA][,]" namely, Plaintiffs' "breach or inaccuracy" of "the representation or warranty" in Section 4.19(a). The product liability claims referenced in Section 4.19(a) and Schedule 4.19(a) appear to be a broader category than those mentioned in Section 1.3(b). Here again, Plaintiffs' construction introduces an element of uncertainty into the reading of the SPA. As discussed above, it requires the Court to ignore several facts about the manner in which the SPA was drafted: (1) the term "Buyer Damages" is given a separate definition in Section 6.2; (2) Section 1.3(b) specifically uses the term "Damages" instead of "Buyer Damages", and further

qualifies "Damages" as those damages paid by Buyer for product liability claims described in Section 4.19(a) for accidents occurring prior to Closing; (3) Section 4.19(a) does not refer to "Buyer Damages"; and (4) Section 1.3(b) does not contain a notice provision or refer implicitly to any notice.

Plaintiffs point out that even though Section 1.3(c) regarding the calculation of the DPA does not contain a notice provision, Defendant still provided written notice of its deduction of the RU-38B Program cost overruns from the DPA. However, in contrast to Section 1.3(b), certain terms contained in Section 1.3(c) (i.e., Indemnity Claim and Indemnity Matter) are defined in the SPA so as to explicitly make notice an element of their definitions. See SPA, pp. 55-56.[5] Therefore, the language used in Section 1.3(c) clearly alerts the parties that some type of notice is required before any amounts are deducted from the Deferred Payment Amount. In contrast, there is no such language in Section 1.3(b), another factor that weighs in favor of Defendant's interpretation.

Furthermore, the Court declines to consider the extrinsic evidence upon which Plaintiffs relies because it finds that the SPA is not ambiguous. See Colson Servs. Corp. v. Insurance Co. of N. Am., 874 F. Supp. 65, 68 (S.D.N.Y. 1994) ("[A]n ambiguity is not

---

[5] "Indemnity Matter" means "any matter" for which Defendant "is or may be entitled to indemnification pursuant" to the SPA of which Plaintiffs' "Agent shall have received notice." SPA, p. 56. "Indemnity Claim" means "a claim for the recovery of Buyer Damages that is disputed by the [Plaintiffs]' Agent." Id., p. 55.

created simply because the parties to an insurance contract put forward different interpretations of its terms, particularly 'where one of two competing constructions is strained or unnatural.'") (quoting County of Schenectady v. Travelers Ins. Co., 48 A.D.2d 299, 301, 368 N.Y.S.2d 894, 897 (3d Dep't 1975)). In any event, the parol evidence adduced by Plaintiffs does not establish the correctness of their  interpretation. Plaintiffs point only to the deposition testimony of Michael Brown, Esq. ("Brown"), an attorney for Sikorsky who was involved in the drafting of the SPA. During Brown's deposition eight years after the fact, Plaintiffs' attorney questioned him, over Defendant's objection, as follows:

> Q.   Section 6.4B2 has a different period of time for
>      making a claim, isn't that correct, in Section
>      6.4B1?
> A.   Yes.
> Q.   And a claim for a breach of a representation
>      and warranty in Section 4.19 is to be made prior to
>      the date 60 days after such claims are finally
>      resolved; is that correct?
> A.   In part, yes.

Brown Dep. 77:17-25, Pls' Ex. F [#62-1]. As Defendant notes, Plaintiffs' attorney asked Brown to read Section 6.4(b) in isolation, without reference to any of the provisions in the SPA at play in the first cause of action. In short, the Court finds that Brown's testimony does not conclusively resolve the questions presented by the first cause of action in Plaintiffs' favor.

Finally, even if notice were required before deducting the PL Litigations' costs from the CPA, Plaintiffs have failed to

demonstrate that they were prejudiced in any way by the alleged lack
of written notice. It is undisputed that Plaintiffs were involved
in, and had knowledge of the course of the PL Litigations both
before and after these cases were settled, as discussed further
below in connection with Plaintiffs' second cause of action.
Plaintiffs have not alleged any particular way in which they were
prejudiced, instead asserting tautologically that they were damaged
because they "did not receive [the] written notice . . . which they
had bargained for. . . ." Plaintiffs' Statement of Material Facts
("Pls' SMF"), ¶ 10. This is insufficient to support a breach of
contract claim, however. See, e.g., Dellicarri v. Hirschfeld, 619
N.Y.S.2d 816, 817 (3d Dep't 1994) (Letter from purchaser's attorney
indicating purchaser's desire to cancel real estate sales contract
because of her inability to obtain loan commitment was effective,
although it was not sent by registered or certified mail, as
required by sales contract; strict compliance with contract's notice
provisions was not required, since vendors did not claim that they
had not received actual notice or that they were in any way
prejudiced as result).

    In reviewing this cause of action, the Court was mindful of the
well-established principle that it "should not strain to superimpose
an unnatural or unreasonable construction" on contract terms that
are clear and unambiguous. Maurice Goldman & Sons, Inc. v. Hanover
Ins. Co., 80 N.Y.2d 986, 987 (1992) (citations omitted). Defendant's

reading of the SPA is clear and unambiguous, while Plaintiffs' interpretation requires a convoluted reading of the SPA's provisions at issue. See Trakansook v. Nahal Realty Corp., 180 A.D.2d 485, 486, 579 N.Y.S.2d 391, 391 (1st Dep't 1992) (rejecting plaintiff's interpretation of the contract because it "unnaturally strain[ed] the contract language used beyond its ordinary meaning") (citing Brainard v. New York Cent. R.R. Co., 242 N.Y. 125, 151 N.E. 152 (1926) ("The words chosen by the parties should not be unnaturally forced beyond their ordinary meaning.") (citation omitted)). The Court accordingly declines to adopt the construction urged by Plaintiffs here. For all of the reasons discussed above, the Court finds that judgment in Defendant's favor is warranted on the first cause of action. Plaintiffs' cross-motion for summary judgment on this cause of action is denied.

### B. Fifth Cause of Action: Failure to Provide Factual Basis in Reasonable Detail of Deduction from the DPA

Plaintiffs allege that Sikorsky breached its obligation to "specify the factual basis", "in reasonable detail", for the $2,840,848 reduction in the DPA, pursuant to Section 1.3(c), for the Indemnity Matter represented by the RU-38B Program cost overruns. The representational warranty at issue in the fifth claim is Section 4.29, in which Plaintiffs warrantied that the "total costs of and the cost to complete" the RU-38B Program "will not exceed those amounts set forth in Schedule 4.29." SPA, § 4.29. In Schedule 4.29

[##76-2, 79][6] of the SPA, Plaintiffs represented that as of June 30, 2004, $13,136,994 had been incurred, and an additional $615,753 was needed to complete the program, for a total program cost of $13,752,747. Plaintiffs also warrantied that "any cost overruns contemplated by such amounts have been appropriately reserved" on the "June 30, 2004 interim financial statement and the Pre-Closing Balance Sheet." Id. However, more than $615,753 was required in order to bring the RU-38B Program to completion after the Closing. The total program cost was $16,593,595, which amounted to a breach of Plaintiffs' representational warranty in Section 4.29 and Schedule 4.29.

Accordingly, on September 21, 2007, Carey E. Bond of Sikorsky sent a letter to Plaintiffs, notifying them that the "most recent estimate of the [RU-38B] Program's . . . cost to complete is $16,598,595," and that therefore $2,840,848 of the DPA was to be withheld. See Dep. Ex. 13 [#48-3]. Bond requested that Plaintiffs "consider [the letter] to be notification of a claim for indemnification pursuant to Section 6.5 of the Stock Purchase Agreement. The anticipated Damages from such claim are $2,840,848." Id.

---

[6]
Schedule 4.29, Bates-stamped SAE 04148-04151, also was marked and introduced as Deposition Exhibit 1. Plaintiffs did not attach any of the Schedules to the SPA to their Amended Complaint.

Plaintiffs do not reference Section 6.5 in their argument, instead contending that in order to withhold any portion of the $4 million set forth in Section 1.3(c), Sikorsky, pursuant to "*Section 6.4(b)(1)* of the SPA, was required to provide a written notice with *reasonable detail* regarding the *factual basis* for the reduction of its payment obligation." Pl's MOL at 29 (emphases supplied). Plaintiffs argue that the September 21, 2007 letter from Sikorsky is insufficiently detailed.

Section 6.4(b)(1), upon which Plaintiffs rely, does not contain the terms "factual basis" or "reasonable detail". See SPA, § 6.4(b)(1). This language in fact is found in Section 6.5(a) (Notice and Payment of Claims), which provides in part as follows:

> If any Buyer Indemnitee or Seller Indemnitee (an "Indemnified Party") believes that it has suffered or incurred, or will suffer or incur, any Damage for which it is entitled to indemnification under this Article VI, the Indemnified Party *shall notify* the party or parties from whom indemnification is being claimed (the "Indemnifying Party"). *This notice shall specify the factual basis of the claim in reasonable detail in light of the circumstances then existing*. . . .

SPA, § 6.5(a) (emphases supplied). Plaintiffs therefore are mistaken in arguing to the Court that Section 6.4(b)(1) entitles them to written notice specifying, in "reasonable detail", the "factual basis" for the reduction in the DPA due to the RU-38B Program cost overruns.

Moreover, Plaintiffs ignore certain language in Section 6.5(a) which provides that the lack of notice for indemnification claims can be excused:

> The failure of an Indemnified Party to give any notice required by this Section *shall not affect any of such party's rights* under this Article VI or otherwise except to the extent that the Indemnifying Party is *actually and materially prejudiced by such failure.*

SPA, § 6.5(a) (emphases supplied). This language is fatal to Plaintiff's claims, because it clearly provides that Defendant's obligations with regard to the calculation and payment of the DPA are not conditioned on fulfillment of its notice obligations. See CIH Intern. Holdings, LLC v. BT United States, LLC, 821 F. Supp.2d 605, 610-11 (S.D.N.Y. 2011) (agreement stated that the failure to give prompt notification "will not affect" BT's right to indemnification, except to the extent that the failure actually prejudices CIH and therefore CIH's indemnification obligations were not conditioned on BT's notice obligations).

Thus, the Court agrees with Defendant that even if Sikorsky's September 21, 2007 notice letter failed to adequately set out, in "reasonable detail", the "factual basis" for the reduction in the DPA, Plaintiffs cannot prevail unless they can show actual and material prejudice from the alleged deficiency in the written notice. This Plaintiffs have not done. As an initial matter, Defendant has pointed to record evidence indicating that Plaintiffs had actual notice of the factual basis for the reduction in the DPA

-20-

caused by the cost overruns. For instance, Paul Schweizer testified that he already knew the details concerning the RU-38B Program cost overruns prior to Sikorsky's September 21, 2007 letter from his so-called "spy" at Schweizer Aircraft. Deposition of Paul Schweizer ("P. Schweizer Dep.") 170:23-171:1, 237:6-8, Ex. 15. In addition, Plaintiffs produced during a discovery a document (Bates-stamped SCH00148-149) prepared by Schweizer Aircraft's Chief Financial Officer dated September 7, 2007, that provides a breakdown of the component costs of the RU-38B Program found in Sikorsky's spreadsheet. See Dep. Ex. 212 [#47-6]; Declaration of Richard Cozzolino ("Cozzolino Decl.") [#47-2], ¶¶ 6-7, Dep. Ex. 14 [#47-3]. Although Paul Schweizer testified that he did not recognize this document at his deposition. The fact remains that it was produced by Plaintiffs to Sikorsky as part of discovery in this litigation.

In any event, even if Plaintiffs had not seen the document prior to this litigation, they have failed to demonstrate how they were actually and materially prejudiced by the allegedly insufficient September 21, 2007 notice letter. It is telling that, upon receipt of Sikorsky's letter, Plaintiffs' attorney sent a letter in which he discussed the DPA reduction and preserved his clients' right to claim the withheld amount, but he did *not* request more detail regarding the RU-38B cost overruns. See Deposition of Phillip Hunter ("Hunter Dep.") 106:18-21, Ex. 75.

Because Plaintiffs were not actually and materially prejudiced by any alleged deficiency in Defendant's notice, Plaintiffs' indemnification obligation, with regard to Section 1.3(c) and the RU-38B Program Cost overruns, remains in place. Accordingly, Plaintiffs' fifth cause of action fails as a matter of law. Defendant's motion for summary judgment as to this claim is granted.

### C.    Second Cause of Action: Breach of Duty to "Work Together and Cooperate"

In their second cause of action, Plaintiffs allege that Defendant breached the SPA by failing to "work together and cooperate" with Plaintiffs in the conduct and settlement of the PL Litigations and "needlessly" decided to settle the PL Litigations for amounts greater than the $1 million reserve set forth in the Schweizer Aircraft 2003 Balance Sheet. See Am. Compl., ¶¶ 42, 85-86. Plaintiffs argue that summary judgment is not appropriate because it cannot be determined as a matter of law what the parties intended by the phrase "work together and cooperate" used in Section 6.6 of the SPA. Defendant argues that the only reasonable conclusion to be drawn from the undisputed facts is that it did "work together and cooperate" with Plaintiffs throughout the process of defending the PL Litigations, and that, ultimately, Defendant was not required to obtain Plaintiffs' approval for the settlements of these lawsuits. Thus, Defendant states, Plaintiffs

-22-

cannot demonstrate any damages arising from the alleged breach of the duty to "work together and cooperate".

The provision of the SPA at issue reads as follows:

> [Sikorsky] shall defend, through counsel of its choosing, any third party claim . . . related to product liability. . . . [Sikorsky and Plaintiffs] shall work together and cooperate in pursuing the defense of any third-party claim . . . related to product liability where such claim . . . will not exceed the limitations of this section.

SPA, § 6.6. However, as Defendant correctly notes, this Section goes on to state that Defendant has the "sole discretion" to control the defense of lawsuits based on product liability and to "compromise or settle" any such litigation:

> If . . . [Sikorsky and Plaintiffs] should not agree with regard to any decision involving a product liability case, . . . [Sikorsky] *shall have the right to conduct and control the defense* and . . . [Sikorsky] *may compromise or settle* any third party claim . . . *at its sole discretion.*

SPA, § 6.6 (emphases supplied).

Where a contract "contemplates the exercise of discretion," the implied duty of good faith inherent in all contracts "includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educational Testing Serv., 639 N.Y.S.2d 977, 979 (N.Y. 1995) (citing Tedeschi v. Wagner Coll., 49 N.Y.2d 652, 659 (1980)); see also Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994) (citations omitted). The applicability of this general standard of reasonableness is called into question, however, given the parties'

negotiation of the specific language employed in the SPA. Defendant notes that when Plaintiffs' transaction counsel inserted the word "reasonably" before "compromise or settle any third-party claim", Sikorsky refused to accept this attempt to restrict its unfettered right to determine the course of the PL Litigations, and deleted "reasonably" from the next draft. See Hunter Dep. 58:4-59:17, Defendant's Exhibit ("Def's Ex.") 67; Declaration of Michael Weiss ("Weiss Decl.") ¶ 4, Def's Ex. 68.

Regardless of how and to what extent Defendant's discretion was limited by the duty to work together and cooperate, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact regarding whether Defendant actually "work[ed] together and cooperate[d]" with them in the defense of the PL Litigations. To the contrary, Plaintiffs were involved in numerous discussions and meetings regarding the defense and proposed settlements of the PL Litigations. See Def's MOL at 9-15 (detailing record evidence that Defendant provided regular e-mail updates about the PL Litigations to Plaintiffs; included Plaintiffs at meetings and accommodated their schedules; solicited Plaintiffs' input and assistance; followed Plaintiffs' instructions; and advocated Plaintiffs' positions) (citations to record omitted).

Notably, Plaintiffs have admitted that their only significant disagreement with Sikorsky's handling of the PL Litigations is that

they believed the settlement amounts were too high.[7] Section 6.6 of the SPA contemplated the precise scenario presented by this case: It provided that in the event of a disagreement between Plaintiffs and Sikorsky regarding the financial exposure presented by, and the settlement value of, the PL Litigations, Sikorsky had the final say.

Moreover, "[t]he fact that the parties did not reach a compromise does not mean that [one party] failed to cooperate." Stop & Shop Supermarket Co. v. Vornado Realty Trust, No. 105819/2003, 2011 WL 5386290, at *35 (N.Y. Sup. Ct. Nov. 4, 2011). As Defendants point out, the fact that the parties disagreed shows that Defendant involved Plaintiffs in the litigation process and provided them with an opportunity to be heard regarding the appropriate settlement value of the cases.

Accordingly, the Court concludes that Sikorsky did not breach its qualified duty to "work together and cooperate" with Plaintiffs in regards to the PL Litigations, and, moreover, did not act in bad faith in defending and settling the PL Litigations. The fourth

---

[7]

At his deposition, the only criticism Leslie Schweizer identified with regard to Sikorsky's handling of the PL Litigations is that he believed more weight should have been given to an alternative causation hypothesis in the Remcho Litigation (i.e., that the victim had a cardiac arrest while piloting the aircraft involved in the accident). See Deposition of Leslie Schweizer ("L. Schweizer Dep.") 272:21-273:10. When specifically asked if, apart from the cardiac arrest theory, there was anything about the lawyers' handling of the PL Litigations with which he had expressed disagreement, Leslie Schweizer replied in the negative. Id. 296:10-12.

cause of action fails as a matter of law, and Defendant's motion for summary judgment on this claim is granted.

### D. Fourth[8] Cause of Action: Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege in their fourth cause of action that Defendant breached the implied covenant of good faith and fair dealing by failing to complete the RU-38B Program within the budgeted amount of $13,752,747. Am. Compl., ¶¶ 89-91.

The covenant of good faith and fair dealing "includes a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Payday Advance Plus, Inc. v. Findwhat.com, Inc., 478 F. Supp.2d 496, 503 (S.D.N.Y. 2007) (quoting Dalton, 639 N.Y.S.2d at 979 (further quotation omitted)). "While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly . . . to create independent contractual rights." Fesseha v. TD Waterhouse Investor Servs., 761 N.Y.S.2d 22, 23 (1st Dep't 2003). see also Witherspoon v. Rappaport, 65 F. App'x 356, 358-59 (2d Cir. 2003) (unpublished opn.) ("The scope of liability for breach of covenant is quite narrow . . . .") (internal citation omitted).

---

[8] As noted above, the Third Cause of Action was dismissed by the Court previously.

According to Plaintiffs, they need not adduce evidence that Defendant acted with malice, bad faith, or other improper motive, and that it is enough for them to show that Defendant's actions actually resulted in the deprivation of Plaintiffs' rights under the contract. This  argument ignores the numerous cases standing for the proposition that "[b]reach of the covenant of good faith and fair dealing requires 'proof of 1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence.'" Continental Cas. Co. v. State of N.Y. Mortgage, No. 94 Civ. 8408(KMW), 1998 WL 513054, at *13 (S.D.N.Y. Aug. 18. 1998) (quoting T.P.K. Constr. Corp. v. Southern Am. Ins., 752 F. Supp. 105, 112 (S.D.N.Y. 1990) (citing Kalisch-Jarcho, Inc. v. N.Y., 58 N.Y.2d 377, 384-85 (1983)). Indeed, "[c]ourts applying New York law 'generally hold that a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive.'" Wagner v. JP Morgan Chase Bank, No. 06 Civ. 3126(RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (emphasis supplied; quoting Fireman v. News Am. Mktg. In-Store, Inc., No. 05 Civ. 11740(MLW), 2009 WL 3080716, at *12 (D. Mass. Sept. 26, 2009) (citing, inter alia, Richbell Information Servs, Inc. v. Jupiter, 765 N.Y.S.2d 575, 587 (1st Dep't 2003); Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 681 (2d Cir. 1983)). Thus, the party claiming that another party failed to act in good faith in performing the requirements of a contract has a

"substantial burden[,]" Zilg v. Prentice-Hall, Inc., 515 F. Supp. 716, 719 (S.D.N.Y. 1981).

As evidence of bad faith, Plaintiffs allege that Defendant "disregarded [Leslie Schweizer]'s Employment Agreement, and allocated resources away from the RU-38B program. . . ." Pl's MOL at 28. In particular, Plaintiffs complain that Defendant transferred Schweizer Aircraft's "best and most experienced engineers" (including Leslie Schweizer) from the RU-38B Program to the X-2 helicopter, a "higher priority" Sikorsky-originiated program. Id. at 27. However, Leslie Schweizer admitted that his successor on the RU-38B Program, Jim Daum ("Daum"), was "the best choice [Schweizer Aircraft] had" for the position other than himself; that Defendant never directed him not to assist Daum with the RU-38B Program; that he could not recall a time that Daum requested his assistance and he was unable to provide it; and that Defendant believed that the X-2 program, to which Leslie Schweizer apparently was shifted, was "an important program for their future in the helicopter business." L. Schweizer Dep. 87:18-22; see also Deposition of William Schweizer ("W. Schweizer Dep.") 106:6-7 (X-2 was a significant program); 159:11-19 (X-2 helicopter set world speed record).

Even if Plaintiffs could show that the personnel transfers "were misguided or ignorant or even merely negligent[,]" Keene Corp. v. Bogan, No. 88 CIV 0217(MBM), 1990 WL 1864, at *16

(S.D.N.Y. Jan. 11, 1990), that alone does not establish a breach of the implied covenant of good faith. Id. Instead, Plaintiffs would be required to show that Defendant acted "contrary to its apparent self-interest such that it would lose more by its alleged misconduct than it saved in payments to [them]." Id. Plaintiffs have failed to point to any record evidence "to support this bizarre scenario." Id.

As further evidence that Defendant acted in bad faith, Plaintiffs cite various production slow-downs, increased costs, and unforeseen expenditures, such as the purchase of a propeller that ultimately was not used. Pl's MOL at 27-28 (citations omitted). However, Plaintiffs admitted during discovery that a number of technical factors-unforeseen at the time of Closing-contributed to the post-Closing increase of the RU-38 Program cost. See L. Schweizer Dep. 59:23-61:15. Leslie Schweizer testified that about five months after the Closing, the estimated costs to complete the RU-38B Program had already increased by $1,184,000 due, in part, to "unplanned extensive readiness certification/testing of engine installation for [the engine supplier]" and "exceedance of acceptable vibration level with respect to the engine installations." L. Schweizer Dep. 8:1-6; 96:18-97:8; 100:24-101:17; 104:1-9, 13-20; 105:6-7. Even if the *effect* of these events was to increase the costs associated with the RU-38B Program, they do not expressly or impliedly demonstrate

or suggest that Defendant acted with the *intent to deprive* Plaintiffs of their rights under the SPA, and Plaintiffs thus have failed to demonstrate a critical element of their claim. See <u>North Am. Realty Advisory Servs., L.P. v. Flint</u>, No. 89 Civ. 5351(LMM), 1992 WL 84897, at *3 (S.D.N.Y. Apr. 10, 1992) ("The key element of a claim for breach of this duty of good faith is whether one party acted with the *intention* of depriving the other party of the benefits of the contract.") (emphasis supplied; citing <u>Carvel Corp.,</u> 930 F.2d at 230). For the foregoing reasons, summary judgment in favor of Defendant on the Fourth Cause of Action is warranted.

**E.    Sixth Cause of Action: Improper Calculation of the RU-38B Program Costs**

For their sixth cause of action, Plaintiffs allege that Sikorsky improperly calculated the costs of the RU-38B Program and, as a result, improperly reduced the DPA. See Am. Compl., ¶¶ 55, 96-97. Defendant and Plaintiffs both have moved for summary judgment on this claim. Plaintiffs assert that Defendant (1) improperly reduced the DPA by $1,142,296 for RU-38B Program cost overruns that already had been deducted in connection with the Purchase Price Adjustment ("PPA") (the so-called "double-dip claim"); (2) erroneously included "estimated costs" of $141,958 in the final RU-38B Program cost tally of $16,593,595; and (3) charged "labor and material costs" for other programs and charged

-30-

"supplemental contracts entered into after Closing" to the RU-38B Program.

### 1.   The Double-Dip Claim

Plaintiffs agreed to two separate provisions by which the RU-38B Program costs could affect their overall payment, the PPA and the DPA. The PPA was calculated as follows:

> If the Net Asset Value of the Company at the close of business on the Closing Date is less than Eleven Million, Six Hundred Fifty-Three Thousand Dollars . . . , then the Purchase Price shall be reduced dollar-for-dollar by the amount of the deficiency. . . .

SPA, § 1.4. With regard to the DPA, Plaintiffs agreed in Section 1.3(c) to a reduction in that amount from $4 million, if the RU-38B Program costs exceeded the total projected cost of $13,752,747, as set out in Schedule 4.29. Plaintiffs represented in Section 4.29 and Schedule 4.29 that the total cost to complete the RU-38B Program, going forward from June 30, 2004, would not exceed $615,753, and that the total contract cost from inception to completion therefore would not exceed $13,752,747. E.g., Pl's SMF, ¶ 33. At contract inception, the costs to complete the RU-38B Program were $11,358,913 with a projected profit percentage of 15.86%, but as of June 30, 2004, the estimated costs to complete the program had increased to $13,752,747 million, reducing the projected profit percentage. This yielded a "charge" to earnings of $1,142,296 for the 6-month period ending June 30, 2004. See Schedule 4.29; Pls' Ex. I [#65-1]. The parties do not dispute that

this $1,142,296 accrued prior to Closing. See, e.g., SPA, Schedule 2.2(d) at 1, ¶ 2 (stating that "[f]inancial write-downs on the RU-38B program created by  the overrun on the development effort . . . is documented in Schedule 4.29"), Dep. Ex. 144 [#76-4]; id. at 3, § IV. ("[In May 2004], the RU-38B forecast was revised and a cost adjustment of $1.142M was calculated for the program. By taking a loss at this time, the program should run on a break even basis until the existing contract is completed.").

On December 1, 2004, Harry Huang ("Huang") of Sikorsky wrote to Plaintiffs' attorney enclosing the Closing Balance Sheet. Dep. Ex. 72 at SAE 03286-89, Pls' Ex. K [#65-3]. Huang stated that "[t]he Net Asset Value of the Company on the Closing Balance Sheet is calculated at $12,923,000. According to the [SPA], the purchase price adjustment is $1,270,000 ($12,923,000 ["(9/23/04 Net Assets + Debt)"]- $11,653,000 ["(12/31/03 Net Assets + Debt)"], in favor of Sellers." Id. Plaintiffs and Defendant agree that the $1,142,296 in cost overruns had the effect of reducing the NAV of Schweizer Aircraft as of the Closing Date, that any reduction in the NAV had the effect of reducing, dollar-for-dollar, the PPA. See Pl's MOL at 22-23. Plaintiffs do not dispute the calculation of the PPA.

Pursuant to the SPA, the DPA was scheduled to be paid three years after the Closing Date. Accordingly, in September 2007, members of the finance departments of Sikorsky and Schweizer Aircraft exchanged e-mails regarding the calculation of the DPA.

Huang, of Sikorsky's finance department, sent an e-mail on September 10, 2007, attempting to "clarify the confusion around the RU-38 rep and warranty data[,]" and calculating the DPA as follows:

(1) [SPA] cost cap guarantee: $13,753M
(2) Total program cost estimate as of Sept. 7: $16,594M
(3) Cost overrun estimate: (2) - (1) = $2.841M
(4) Cost overrun reserved on seller's closing balance sheet: $0M
(5) Cost overrun eligible for claim of breach of 4.29: (3) - (4) = $2.841M"

Dep. Ex. 184, SIKP00003142 [#77-3]. Sharon Reed ("Reed"), Chief Financial Officer of Schweizer Aircraft, disputed this assertion regarding the existence of a reserve, informing Huang in several emails that Schweizer Aircraft did have a reserve of $1,582,428 on their Closing Balance Sheet. Dep. Ex. 184, SIKP00003141. On September 7, 2007, Sikorsky's Richard Cozzolino ("Cozzolino") disagreed, noting he "still believe[d] that the $1.58M reserve was not part of the [C]losing [B]alance [S]heet" but "was booked in Purchase Accounting as part of the Opening Balance Sheet." Dep. Ex. 185, SIK00032019 [#77-3].

Based on subsequent correspondence in the record, it appears that the dispute regarding the $1.58 million reserve was resolved in Sikorsky's favor. For instance, on September 21, 2007, Sikorsky sent a letter to Plaintiffs stating that its Finance Department had checked with Schweizer Aircraft's Financial Department and

confirmed that the Closing Balance Sheet prepared by Schweizer provided the excess cost provisions for the Program up to the estimated cost or $13,752,747. The provisions required to cover the Program's costs in

-33-

> excess of $13,752,747 were not made to the Closing
> Balance Sheet, but by Sikorsky to the Schweizer
> Aircraft's balance sheet after Closing.

Dep. Ex. 13 [#65-3]. The Court notes that in regards to the current motions, Plaintiffs have not raised the issue of the $1,582,428 reserve that Reed reported to Huang in September 2007, as being a factor in the allegedly improper calculation of the DPA.

Plaintiffs thus are basing their "double dip" argument on the same key figures relied on by Defendant. When Reed and Huang exchanged e-mails regarding the calculation of the DPA, the only figure they disputed was the existence of an $1,582,428 reserve on Schweizer Aircraft's Closing Balance Sheet. That is, Reed and Huang agreed that the DPA should be calculated by subtracting the SPA's "cost cap guarantee" of $13,752,747 from the total program cost estimate as of September 7, 2007, of $16,593,595. They disagreed only about whether Schweizer Aircraft had reserved $1,582,428 on its Closing Balance Sheet which would offset the cost overrun estimate of $2,840,848.

Even though plaintiffs apparently are relying on the same numbers as Defendant, they nevertheless maintain that Defendant is incorrect that the additional cost overruns that reduced the DPA by $2,840,848 started with the first dollar that actual RU-38B Program costs exceeded the June 30, 2004 cost projection of $13,752,7474, and do not include any program costs incurred up to that amount. After searching the record, the Court finds that Plaintiffs have

failed to raise a genuine issue of material fact with regard to their double dip claim, given that they (1) agree with the methodology used by Defendant in calculating the DPA;[9] and (2) agree that the RU-38B Program cost overruns from December 31, 2003, to June 30, 2004, in the amount of $1,142,296, had been accrued *prior* to Closing, and were included in the "cost cap guarantee" (set out in Schedule 4.29) of $13,752,747. It necessarily follows that the $1,142,296 would not be included again in the estimated cost at completion of $15,593,595. As Defendant explains, "because the unanticipated additional $1,142,296 in contract costs were incurred before the Plaintiffs' June 30, 2004 cost to complete projection, the $1,142,296 was reflected in the [PPA][,]" Def's Reply at 14, which was based on the NAV of Schweizer Aircraft. Had the $1.142 million in additional program costs been recorded at a subsequent time, the amount would have been reflected in a larger debit of the DPA. Id.

Plaintiffs attempt to create an issue of fact by arguing that Defendant's 2013 refund to them of $145,799 plus interest proves that Defendant deducted the $1,142,296 on two occasions. The issue concerning the $145,799 first arose in December 2004, when Sikorsky proposed adjusting the post-Closing Balance Sheet (and, as a

---

[9] See Plaintiffs' Responses to Defendant's Supplemental Statement of Material Facts [#77-1], Response to ¶ 79 (citing Dep. Ex. 13, Ex. K to Pl's App. [#65-3]; Pls' Exs. 184 & 185, Ex. P to Pls' 2nd App. [#77-3]).

result, the PPA) to reflect a $145,799 increase to the excess costs projected for the RU-38B Program, Dep. Ex. 72 at SAE 03289 [#65-3]. At that time, however, Plaintiffs did not object or otherwise question this adjustment, although they were entitled to do so under the SPA. See SPA, § 1.5(b), (c). Subsequently, when calculating the DPA in September 2007, Sikorsky mistakenly included the $145,799 in the deduction. After being notified on September 21, 2007 about the reduction in the DPA, Plaintiffs again failed to object. Indeed, when Plaintiffs' attorney responded in October 2007, to the September 21, 2007 notice letter regarding the DPA, Plaintiffs mentioned nothing about the $145,799. In fact, Plaintiffs did not call Sikorsky's attention to the issue until 2012, when they filed their Amended Complaint. After learning of its error, Sikorsky  refunded to Plaintiffs the $145,799 plus applicable interest, per Section 6.1 of the SPA.

As Defendant has explained, the two figures are distinguishable—the $145,799 was part of the cost overrun in the RU-38B Program that had occurred after June 30, 2004, and not reflected in the June 30, 2004 cost to complete estimate of $13,752,7474. The $1,142,296 in cost overruns occurred *before June 30, 2004*, and this figure was reflected in the $13,752,747. Contrary to Plaintiffs' contention, the Court finds that there was a "principled basis" for Defendant to refund the $145,799, and

rejects Plaintiffs' attempt to transform this erroneous deduction and subsequent refund into a triable issue of fact.

### 2.   Inclusion of $141,958 in "Estimated Costs"

Plaintiffs argue that Sikorsky improperly included, in its calculation of the post-Closing costs of the RU-38B Program, $141,958 in estimated costs. Plaintiffs rely on an e-mail from the accounting manager at Sikorsky stating that "[o]f the $16,593,595 total . . . costs to complete the program, $141,958 is the estimated portion (i.e. costs to complete). The remainder of the total has been incurred." Dep. Ex. 186, Pls' Ex. K [#66-1].

Plaintiffs argument is undermined by the express language of the SPA, which permitted Sikorsky to debit from the DPA "anticipated Damages reasonably determined by the Buyer in respect of any open Indemnity Claims and any open Indemnity Matters on the date 36 months after the Closing Date." SPA, § 1.3. As Defendant notes, the due date for payment of the DPA was not based on the actual completion of the RU-38B Program, but was fixed by the SPA (i.e., within 36 months of September 23, 2004). Furthermore, when Defendant sent its September 21, 2007 letter to Plaintiffs regarding the debit of $2,840,848 from the DPA, Defendant stated that $16,593,595 represented the "most recent estimate of the Program's costs of and costs to complete." Dep. Ex. 13. As Defendant notes, Plaintiffs' lengthy response to the September 21, 2007 letter did not contest the inclusion of the $141,958. Again,

Plaintiffs have attempted to manufacture a material question of fact out of an issue so minor that it did not warrant mention at the time. Plaintiffs must do more than "simply show that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586.

### 3.   Overstatement of Costs

Plaintiffs contend that apart from the "double dip" and estimated costs allegations there are "numerous factual issues" which require resolving in this cause of action. Plaintiffs assert in a conclusory fashion that "labor and material costs" for other programs and for "supplemental contracts entered into after Closing" were "improperly charged" to the RU-38B Program. However, the only example piece of record evidence to which Plaintiffs cite is an email from Sharon Reed, Schweizer Aircraft's CFO, dated September 7, 2007, in which she states that an audit was being conducted as to the "material dollars charged to the program", and that there "could be" an overage of $50,000 and $500,000." Pl's MOL at 30 (citing Dep. Ex. 63). At her deposition, Reed testified that the "audit" consisted of having Jim Daum manually review boxes of invoices; however, this process apparently never was completed. Reed admitted that she "had no specific idea of what the number in that range [was] likely to be[.]" Reed Dep. 133:16-20, 132:1-10, 12-15. Thus, at best, Reed's assertion that there "could be" materials overcharges in the range of $50,000 to $500,000 was an

unsubstantiated guess. Plaintiffs "may not rely on . . . unsubstantiated speculation[,]" <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted), to raise a genuine issue of fact.

After combing the record, the Court has failed to find any affirmative evidence to support Plaintiffs' assertion that Sikorsky miscalculated the $2,840,848 debit of the DPA, let alone evidence sufficient to create a genuine issue of material fact. Accordingly, the sixth cause of action fails as a matter of law. Defendant's motion for summary judgment as to the sixth cause of action is granted, and Plaintiff's cross-motion is denied.

## VI.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. Plaintiffs' Cross-Motion for Partial Summary Judgment and Amended Cross-Motion for Partial Summary Judgment are denied. The Amended Complaint is dismissed. The Clerk of the Court is requested to close this case.

**SO ORDERED**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     October 27, 2014
           Rochester, New York.

-39-